# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-3750

SPHERE DRAKE INSURANCE LIMITED, also
known as ODYSSEY, formerly known
as ODYSSEY Re (London) Limited,

*Plaintiff-Appellee*,

*v.*

AMERICAN GENERAL LIFE INSURANCE COMPANY,
formerly known as ALL AMERICAN LIFE
INSURANCE COMPANY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 4573—**William T. Hart**, *Judge.*

ARGUED APRIL 1, 2004—DECIDED JULY 16, 2004

Before FLAUM, *Chief Judge*, and COFFEY and EVANS,
*Circuit Judges.*

EVANS, *Circuit Judge.* This multimillion dollar dispute
concerns the validity of a reinsurance contract between All

American and Sphere Drake.[1] Sphere Drake argues that its broker, Euro International Underwriting (EIU), lacked either actual or apparent authority to bind Sphere Drake to the reinsurance policy. The company contends that EIU had the authority to represent Sphere Drake only up to a certain dollar amount, a limit EIU exceeded when it entered the reinsurance contract with All American. Thus, Sphere Drake argues, the policy is void. All American, in contrast, contends that the contract is valid and enforceable.

The larger underlying controversy between these parties regards Sphere Drake's refusal to pay tens of millions of dollars in coverage All American contends it is owed under seven reinsurance contracts, including the one at issue here, referred to as the Unicare retrocession. Sphere Drake agreed to arbitrate the six non-Unicare contracts, and the arbitrators concluded that Sphere Drake was not bound because EIU lacked actual or apparent authority to enter into the contracts. All American, not liking the arbitration results, then filed suit in federal court. The district court set aside the arbitration decision on the grounds that one of the arbitrators displayed "evident partiality," a decision we reversed in what, chronologically, was the second time this conflict reached our door. *Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co.*, 307 F.3d 617, 620 (7th Cir. 2002) (*Sphere Drake II*).

While agreeing to arbitrate the six non-Unicare cases, Sphere Drake filed suit in the Northern District of Illinois seeking a declaratory judgment that it was not required to arbitrate the Unicare dispute, insisting that the retroces-

---

[1] During the course of the life of this case, both Sphere Drake and All American have gone through various name changes. For example, in 2002, All American merged into American General Life Insurance Company. We will refer to both parties as "Sphere Drake" and "All American," respectively, however, regardless of the time period at issue.

sion did not contain an enforceable arbitration provision. The district court ruled in Sphere Drake's favor. On appeal (the first time this dispute reached us), we ruled that the retrocession did contain an arbitration clause. *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 589 (7th Cir. 2001) (*Sphere Drake I*). Significant for our purposes here, however, we noted that whether there is a contract in the first place is a matter for the courts, not an arbitrator, to decide. *Id.* at 591. Thus, we held, "Sphere Drake may be required to arbitrate if and only if EIU had authority to bind it to these reinsurance contracts." *Id.* at 592. Accordingly, we remanded with instructions for the district court to "resolve the parties' only real dispute:  the extent of EIU's authority." *Id.*

On remand, Sphere Drake filed a consolidated amended complaint for declaratory judgment. It sought a declaration that the Unicare retrocession was void *ad initio* on two grounds: (1) EIU had written the contract in breach of an express limit on the amount of premium EIU was authorized to accept; and (2) the Unicare retrocession was written in furtherance of a conspiracy between EIU and Stirling Cooke (the broker that placed the contract on All American's behalf) and was therefore an act in breach of the fiduciary duties EIU owed to Sphere Drake. The district court bifurcated these issues. 221 F. Supp. 2d 874 (N.D. Ill. 2002). The effect is that only Sphere Drake's "excess authority" claim is involved in this litigation. The "fiduciary duty claim" will be resolved in a separate arbitration if Sphere Drake loses on its excess authority claim. *Id.* at 878, 880.

Both parties filed cross-motions for summary judgment with respect to whether EIU exceeded its authority. The district court granted summary judgment in Sphere Drake's favor and denied All American's cross-motion, holding that EIU overstepped its authority in writing the Unicare retrocession and that Stirling Cooke knew EIU lacked authority to write the risk. Accordingly, the court held, EIU

lacked actual and apparent authority to bind Sphere Drake to the Unicare retrocession. 300 F. Supp. 2d 606, 617-22 (N.D. Ill. 2003). The court also rejected All American's affirmative defenses of ratification, waiver, and estoppel, *id.* at 622-29. Thus, it held the Unicare retrocession void *ab initio*. All American appeals. We review *de novo* the district court's grant of summary judgment to Sphere Drake.

Sphere Drake is an insurance company that underwrites reinsurance protection for other insurance companies, known as retrocessional coverage.[2] In January 1997, Sphere Drake negotiated with John Whitcombe, who was in the process of establishing EIU, regarding EIU underwriting business for Sphere Drake. The business plan the parties agreed to stated that "EIU will undertake to achieve the following gross premium forecasts:  £10 million for year 1 [1997], £14 million for year 2 [1998], £20 million for year 3 [1999]."

The agreement was formalized under a binding authority which authorized EIU to enter into certain types of insurance and reinsurance contracts on Sphere Drake's behalf. The binding authority, however, limited the amount of gross estimated premium income that EIU was authorized to write. It provided that the "initial Estimated Gross Premium" was not to exceed £2 million (the equivalent of $4 million pursuant to a $2 to £1 conversion rate set forth in the binding authority) (for convenience purposes, we will refer to the dollar, not pound, value throughout the balance of this opinion). The binding authority also specifically stated that the premium estimate would be "increased by mutual agreement."

---

[2]  As the Supreme Court has noted, "[i]nsurers who sell reinsurance themselves often purchase insurance to cover part of the risk they assume from the primary insurer; such 'retrocessional reinsurance' does for reinsurers what reinsurance does for primary insurers." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 773 (1993).

EIU, on March 3, 1997, requested an increase in the annual premium limit to $7 million. Sphere Drake authorized the increase, including business already written. On December 29, 1997, in response to another request from EIU, Sphere Drake increased the 1997 premium limit to $12 million.

On February 2, 1998, EIU submitted a proposal to increase the premium limit for 1998 to $15 million. Sphere Drake rejected this figure. On February 26, 1998, EIU again sought an increase and proposed a limit of $16 million. Sphere Drake again refused the proposed increase.

Not to be deterred, in April and May 1998, EIU again tried to increase the premium limit. Vic Broad, Sphere Drake's underwriter in charge of the binding authority, denied the request and advised Whitcombe that he could not increase the limit without the approval of Michael Watson, Sphere Drake's CEO. On June 3, 1998, Whitcombe met with Watson and expressed a desire that EIU be permitted to write more premium, stating that he was dissatisfied with the fact that increases had to occur on a piecemeal basis.

Watson informed Whitcombe that Broad would handle the decision with respect to any request for an increase. At a trial in the United Kingdom,[3] Watson testified about the

---

[3] In 2000, Sphere Drake filed suit against EIU, Stirling Cooke, and others, but not including All American, in the United Kingdom alleging that the contracts EIU bound were the product of fraud. After a year-long trial, the English Commercial Court held that Stirling Cooke had, beyond a reasonable doubt, dishonestly assisted EIU in breaching EIU's fiduciary duties to Sphere Drake. *Sphere Drake Ins. Ltd. v Euro Int'l Underwriting Ltd.*, 2003 WL 21729222 (Q.B. July 8, 2003).

Before the district court, Sphere Drake sought to bar All
(continued...)

meeting, "I was certainly aware that [Whitcombe] wanted to increase—he wanted more capacity but no formal request or even informal request was made as far as I was concerned." After the June 3 meeting, according to Watson, the matter of Whitcombe's desired increase "remained outstanding." At the same trial, Whitcombe stated that he believed Watson had agreed "in principle" to give him the authority to write up to $20 million in premium incomes. Whitcombe admitted, however, that he understood that any premium increase had to be first addressed with Broad.

Six days after the meeting, Whitcombe wrote to Watson:

> It is my understanding that controlled expansion to a level of premium income in the region of $20,000,000 for 1998 would not alarm you and would certainly afford me a sound basis on which to plan events.
>
> I am aware that you will be discussing our conversation with Vic Broad with a view to settling your own plans and wishes for the future. I will await his instructions.

---

[3] (...continued)
American from introducing the UK trial transcript on the ground that the trial testimony was inadmissable hearsay. The district court denied Sphere Drake's motion. Citing our decision in *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002), the district court held that "[p]rior testimony under oath, whether at a deposition, hearing, or trial, that is based on personal knowledge may be considered on summary judgment because the person is likely to provide the same testimony if called to testify at trial. It is well settled that testimony given at the trial of a different case may be considered on summary judgment." In a footnote of its respondent's brief, Sphere Drake contends that the district court erred. For reasons that will be clear, this testimony does not impact the outcome of our decision, and it is therefore not necessary for us to evaluate Sphere Drake's contention.

Watson responded on June 17, writing that he had asked Broad to address the "relevant underwriting issues" but that Whitcombe should "continue on a 'business as usual' basis." Watson was "absolutely unaware of anything approving an increase."

During this time, EIU continued to underwrite contracts for Sphere Drake. In 1998, prior to writing the Unicare retrocession, EIU accepted 24 contracts totaling $14,406,427 in gross estimated premiums. With the exception of a single contract (for which the estimated premium was $81,818), the purchase of all of the 1998 risks EIU accepted under the binding authority was brokered through two affiliated reinsurance intermediaries, Stirling Cooke Brown Insurance Brokers Limited and Stirling Cooke Brown Reinsurance Brokers Limited (collectively, Stirling Cooke), the same company that brokered the Unicare retrocession.

In dealing with EIU, Jeffery Butler, the Stirling Cooke broker who placed the Unicare retrocession, Butler's assistant Adrian Mortley, and Richard Wells, Stirling Cooke's compliance officer, admitted that in 1997 they received a copy of the binding authority. Butler stated that in doing so, he would have noted that the binding authority limited the amount of premium EIU was authorized to accept on Sphere Drake's behalf. On February 27, 1998, Butler was again sent copies of the binding authority which contained the premium limit increase to $7 million. By that time, Sphere Drake had increased the 1998 premium limit to $12 million. Stirling Cooke did not, however, obtain a copy of that increase prior to placing the Unicare retrocession.

In mid-1998, WEB Management LLC (WEB), acting on behalf of All American, approached EIU through Stirling Cooke to procure reinsurance protection for All American's participation in a reinsurance contract issued to Unicare Insurance Company. On June 29, 1998, EIU agreed to pro-

vide such coverage on behalf of Sphere Drake, and the coverage was bound pursuant to the Unicare slip.[4] According to Sphere Drake, the slip involved premium in the amount of $6,208,125 that was to be counted against EIU's alleged 1998 premium limit.[5]

That same month, Sphere Drake became concerned with EIU's administration of the binding authority, and it began an audit of the EIU binder. Michael Mather and John Coppinger, two employees from the U.S. arm of Sphere Drake, conducted the audit at EIU's offices on July 28 and 29, 1998. In their report, which they presented to Sphere Drake's senior management on August 5, 1998, the auditors stated that EIU had exceeded its premium cap of $12 million. Two days later, on August 7, Watson told

---

[4] A reinsurance slip is a contract, in abbreviated form, between the reinsured and the retrocessionaire. *See Compagnie de Reassurance D'lle de France v. New England Reinsurance Corp.*, 825 F. Supp. 370, 374 (D. Mass. 1993), *aff'd in part, vacated in part, rev'd in part*, 57 F.3d 56 (1st Cir. 1995). It "summarizes on one or two pages the terms of the reinsurance agreement negotiated with the reinsurer." Eric Mills Holmes, 14 *Holmes' Appleman on Insurance 2d* § 105.2 at 163 (2000). Although an "extremely brief document," it is "legally binding." *Id.* at 164.

[5] The $6.2 million premium figure is based on the dollar amount shown on the slip policy. Nick Bentley, a Sphere Drake designee, testified that that is the amount that would have been apparent to an underwriter at the time the slip policy was issued. Sphere Drake contends, however, that undisputed evidence shows that the Unicare retrocession itself actually represented $19,659,062 in estimated gross premiums for 1998. All American argues, however, that the correct 1998 gross premium calculation for the retrocession is $9,864,917, the dispute being whether the over $19 million premium should be evenly divided between 1998 and 1999 or considered only for 1998. Because it is not necessary to resolve this dispute, we will accept for our purposes the number contained in the slip.

Whitcombe that EIU had "exceeded the premium cap and that [EIU] needed to stop underwriting."

The premium due under the Unicare slip was $4,966,500 to be paid in quarterly installments throughout the year. By the end of 1998, All American had paid $3,166,144 in premium (less EIU's commission) to Sphere Drake. In December 1998, All American, via Stirling Cooke, requested that Sphere Drake post a letter of credit covering incurred losses on the Unicare retrocession. Sphere Drake refused to do so and asserted in a letter dated December 31, 1998, which was copied to Stirling Cooke, that it was reserving its position with respect to All American's request pending a review of the binding authority. That same week, on January 4, 1999, Sphere Drake reiterated its position to Stirling Cooke. Later that month, a representative of Fairfax (Sphere Drake's parent company) spoke to a senior vice-president of All American and offered to return the premiums accepted under the Unicare retrocession. All American refused. On February 4, 1999, All American acknowledged in a letter from the company's general counsel that as of January 8, 1999, Sphere Drake had "taken issue with [EIU's] authority to place business." In March 1999, Sphere Drake sought to rescind the Unicare policy and return the premium. When All American rejected Sphere Drake's offer, Sphere Drake refused to pay any claims arising under the reinsurance contract. In response, All American commenced arbitration which, after the lengthy litigation discussed above, led to this matter.

Before proceeding to the merits, we briefly address the choice-of-law issue in this case, a matter which neither party disputes on appeal. The Unicare retrocession provides that "[t]his contract of Reinsurance shall be governed by and construed in accordance with the law of the state of Illinois, U.S.A." Before the district court, Sphere Drake argued that this provision is inapplicable to whether there

is a binding contract. Instead, it stated that the district court should apply English law because the United Kingdom has the most significant relationship to the transaction. The court held, however, that since Illinois and English law with regard to the disputed issues are the same, "[t]his issue need not be decided." Based on the same sound reasoning, as well as the fact that both parties rely on Illinois law in their briefs to this court, we, too, will apply Illinois law. *See Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n.7 (7th Cir. 1993) ("Where the parties have not identified a conflict between the two bodies of state law that might apply to their dispute, we will apply the law of the forum state . . . .").

Turning to the merits, we must determine if the district court was correct that there is no issue of material fact that EIU was not, at the time the Unicare retrocession was signed, Sphere Drake's agent. Agency is a fiduciary relationship in which the agent has the power to act on the principal's behalf. *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 759 N.E.2d 174, 181 (Ill. App. Ct. 2001). "An agent's authority may be either actual or apparent . . . ." *Id.* However, "[o]nly the alleged principal's words and conduct, not those of the alleged agent, establish the agent's authority." *Id.* Finally, the party alleging an agency relationship, here All American, bears the burden of proving its existence by a preponderance of the evidence. *Id.*

With those background principles in mind, we turn to whether EIU had the actual authority to bind Sphere Drake to the retrocession. "An agent has express authority when the principal explicitly grants the agent the authority to perform a particular act." *Id.* Here, the evidence is clear that at the time EIU signed the retrocession it did not have the authority to do so. The binding authority capped the amount of estimated gross premium EIU was permitted to write with respect to each given year. Increases to the premium limit, moreover, were accomplished over time only

by endorsement. All American cannot point to any evidence that the premium limit was ever increased above $12 million, an amount that EIU exceeded before it entered into the Unicare retrocession (it is undisputed that for 1998 EIU wrote contracts prior to the Unicare retrocession in the amount of $14,406,427).

In the face of this evidence, All American relies on EIU's business plan (which was provided to Sphere Drake at the beginning of negotiations over the binding authority and was initialed and agreed to by Sphere Drake) to argue that the contractual premium limit was increased to $20 million. The plan, however, merely *forecasted* that gross premiums would increase to $20 million for 1997 and $28 million for 1998 (in fact, All American's argument is a bit odd; based on the business plan, the premium increase in 1998 should have been $28 million, not the $20 million amount All American focuses on). The business plan, moreover, was executed prior to the binding authority, which is the actual agency contract.

Equally unconvincing is All American's argument that the meetings and correspondence between Sphere Drake and EIU during 1998 evidence Sphere Drake's agreement to increase the premium limit to $20 million. The evidence establishes that Whitcombe did meet with Watson, who looked favorably upon increasing the premium level. Watson, however, clearly told Whitcombe that Whitcombe had to further discuss the matter with Broad. In the meantime, Watson wrote that Whitcombe should continue with "business as usual"—the only reasonable interpretation of which is that the premium level remained at the $12 million level.

Therefore, at the time the Unicare retrocession was written, the premium limit in the binding authority was $12 million, and because that limit was already exceeded, EIU lacked the actual authority to accept the Unicare retro-

cession. The district court's finding that there was no issue of material fact that EIU lacked the actual authority to accept the Unicare retrocession was clearly correct.

We next turn to whether EIU had the apparent authority to accept the retrocession. Illinois law has long recognized the doctrine of apparent authority. *See, e.g., Gilbert v. Sycamore Mun. Hosp.*, 622 N.E.2d 788, 795 (Ill. 1993). As the Illinois Supreme Court has noted,

> [a] principal will be bound by not only that authority which he actually gives to another, but also by the authority which he appears to give. Apparent authority in an agent is the authority which the principal knowingly permits the agent to assume, or the authority which the principal holds the agent out as possessing. It is the authority which a reasonably prudent person, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess. Where the principal creates the appearance of authority, the principal "will not be heard to deny the agency to the prejudice of an innocent party, who has been led to rely upon the appearance of authority in the agent."

*Id.* (citations omitted).

Under Illinois law, the party asserting the existence of apparent authority, here All American, must meet a three-part test:

> (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal; and (3) the third person justifiably and detrimentally relied on the agent's apparent authority.

*Amcore Bank*, 759 N.E.2d at 183. We will address each part of the test in turn.

To begin, the evidence establishes that Sphere Drake did not knowingly acquiesce in EIU's exercise of authority. As noted above, the binding authority explicitly limited EIU's authority to agree to premiums above a certain amount— at the time $12 million. It was not until August 1998— *after* the retrocession was signed (on June 29, 1998)—that Sphere Drake had knowledge regarding the cost of the Unicare retrocession or the fact that the premium limit had been exceeded. In fact, the evidence shows that the most recent bordereau[6] EIU provided to Sphere Drake prior to accepting the Unicare retrocession was in May 1998. That bordereau specifically indicated that EIU was still within the premium limits. Because of this misrepresentation, it was not possible for Sphere Drake to "knowingly acquiesce" in EIU's actions.

Second, and in many ways more significant, it was not reasonable for All American to conclude that EIU was, at the time, authorized to bind Sphere Drake to the retrocession. As the *Restatement (Second) of Agency* makes clear,

> if a person has means of knowledge reasonably open to him as to the limits of the agent's authority, he cannot hold the principal unless he uses ordinary diligence to ascertain them, even in those situations in which a principal is otherwise held although the agent goes beyond his authority. He has means of knowledge if he knows or has reason to know that the authority is evidenced by a document open to and intended for his inspection.

*Restatement (Second) of Agency* § 167 cmt. a. *See also General Ref. & Plumb. Co. v. Goodwill Indus. of St. Louis,*

---

[6] A bordereau is "[a] report provided periodically by the reinsured detailing the reinsurance premiums and/or reinsurance losses with respect to specific risks ceded under the reinsurance agreement." *Holmes* § 102.6 at 57.

*Missouri*, 333 N.E.2d 607, 611 (Ill. App. Ct. 1975) (The principal may act on a presumption that third persons dealing with the agent "will not be negligent in failing to ascertain the extent of his authority as well as the existence of his agency" (quoting 3 Am.Jur.2d, Agency, § 78 (1962)).); *Lawcock v. U.S. Trotting Ass'n*, 204 N.E.2d 802, 805-06 (Ill App. Ct. 1965) ("third person asserting apparent authority may not act negligently with regard to extent of agent's authority or blindly trust agent's statement"); *Application of Lester*, 386 N.Y.S.2d 509, 514 (N.Y. Sup. Ct. 1976) (stating that "[t]he ordinary rule is that 'Diligence to ascertain if an agent is exceeding his authority devolves on those who deal with him, not on his principal'") (quoting *Richmond Guano Co. v. E.I. DuPont de Nemours & Co.*, 284 F. 803, 809 (4th Cir. 1922)).

Here, All American had the means to determine the extent of EIU's authority. Stirling Cooke, at the time All American's agent (more on this later), knew that EIU's authority to accept business for Sphere Drake was limited by a premium cap contained in the binding authority. In fact, by February 27, 1998, Stirling Cooke had obtained a copy of the binding authority showing a premium limit of $7 million (there is no evidence that Stirling Cooke knew that Sphere Drake increased the premium limit to $12 million). Equally significant, it had knowledge that EIU had already written premium in excess of $7 million (and, in fact, $12 million). Indeed, prior to placing the Unicare retrocession, Stirling Cooke had placed 1998 contracts with EIU with premiums to Sphere Drake totaling over $14 million. Whether it knew the exact limit or not, a reasonable broker in Stirling Cooke's situation who knew about the limit in the binding authority would have investigated what the dollar limit was. We cannot therefore say that it exercised due diligence or that it was reasonable to believe that EIU had the authority to bind Sphere Drake at the time it signed the retrocession.

Nevertheless, All American argues that it acted reasonably and that it had no obligation to determine the limits of EIU's authority prior to placing the retrocession. Specifically, it contends, quoting a decision from the Court of Appeals of Indiana, that "the law is clear that a third person dealing with [an agent] is not bound to inquire into his specific authority, nor is the principal protected by secret limitations upon the authority of such an agent." *Yellow Mfg. Acceptance Corp. v. Voss*, 303 N.E.2d 281, 283-84 (Ind. Ct. App. 1973). All American also points to *American Insurance Co. v. Meyer Steel Drum, Inc.*, 1990 WL 92882, at *4 n.4 (N.D. Ill. June 27, 1990), for the proposition that "[w]here an agent has apparent authority to act, the principle will be liable in spite of undisclosed limitations the principle has placed on that authority." Reliance on these cases is misplaced, however. EIU's authority was not constrained by "undisclosed" or "secret" limitations. To the contrary, Stirling Cooke knew that EIU was bound by a premium cap, it just did not know what the exact limit was.

A contrast with *Meyer Steel Drum*, which All American argues is "similar to the present case," is illustrative. There, in support of the conclusion that the purported agent had apparent authority, the court found "[t]here is no evidence demonstrating that Meyer Steel Drum disclosed to American that [the agent] was authorized only to secure insurance with annual premiums not exceeding $50,000." In other words, there was no evidence that American knew about any premium limit. In such a circumstance, it may be reasonable for the insurer not to inquire into whether a limit existed and, if so, what the value of the limit was. That is a critically different situation than the one All American faces, where it knew EIU's authority was confined, had knowledge that the limit it was aware of had been exceeded, and knew the limit was subject to change.

All American also relies on industry custom. Custom and practice in the industry is relevant towards determining whether a third party acted reasonably and diligently. *See, e.g.*, *Property Advisory Group, Inc. v. Bevona*, 718 F. Supp. 209, 211-12 (S.D.N.Y. 1989) (examining practice and custom in determining apparent authority issue); *Lincoln Cardinal Partners v. Barrick*, 578 N.E.2d 316, 318 (Ill. Ct. App. 1991) (same). Here, several witnesses testified that the normal practice is that a broker such as Stirling Cooke does not have a duty to determine if there is a premium cap or to monitor the amount of gross premium written by an underwriter like EIU. In a traditional situation, such a custom makes sense. A third party may not know the existence of a premium cap and would usually lack the necessary information as to an agent's other business. In this particular circumstance, however, such a custom carries little weight. First, Stirling Cooke knew that a premium cap existed and knew it was subject to change. Even more significant, the vast majority of the business EIU conducted on behalf of Sphere Drake was with Stirling Cooke. In fact, of the 24 contracts EIU accepted for Sphere Drake prior to the Unicare retrocession (totaling over $14 million), Stirling Cooke brokered all but one of them (for which the estimated premium to Sphere Drake was $81,818). Stirling Cooke did not have to monitor all of EIU's business to determine if EIU had exceeded the premium cap. It only had to keep track of the business it had done.

Finally, All American contends that requiring it to monitor EIU's actions would constitute "unsound public policy." It has long been established, however, that one who deals with an agent "takes the risk not only of ascertaining whether the person with whom he is dealing is the agent, but also of ascertaining the scope of his powers." *Ernst v. Searle*, 22 P.2d 715, 717-18 (Cal. 1933). *See also Henry Modell & Co. v. City of New York*, 552 N.Y.S.2d 632, 634 (N.Y. App. Div. 1990) (those who deal with "agents must

ascertain the extent of the agents' authority, or else proceed at their own risk"). In sum, Stirling Cooke had knowledge that EIU was constrained by a premium limit and knew that by itself Stirling Cooke, before the Unicare retrocession, entered into business with EIU totaling over $14 million. Contrary to All American's suggestion that "knowledge that there is a premium limit that will be increased over time is far different from knowing what the limit is," considering the facts of this case, we believe it would have constituted a minimal burden to ascertain the limits of EIU's authority. In fact, a simple phone call inquiring into the premium limit would have done the trick. Any reliance on EIU's authority was thus unreasonable and cannot be used to create the existence of apparent authority.

In the alternative, All American contends that Stirling Cooke's knowledge of EIU's lack of authority cannot be imputed to All American because Stirling Cooke acted "as a neutral reinsurance intermediary between the parties, rather than as any party's agent." A reinsurance intermediary, however, is considered an agent. "Whether a broker is an agent for the insured, the insurer or both," however, is "a question of fact." *Capitol Indem. Corp. v. Stewart Smith Intermediaries, Inc.*, 593 N.E.2d 872, 876 (Ill. App. Ct. 1992). *See also Philan Ins. Ltd. v. Frank B. Hall & Co.*, 748 F. Supp. 190, 197 (S.D.N.Y. 1990) ("specific factual situation demonstrating the parties' intent determines whether the intermediary acts as agent of the ceding insurer or of the reinsurer"). We emphasize, moreover, that the "the general rule is that a reinsurance intermediary serves as the cedent's agent." Stephen W. Schwab, et al., *Caught Between Rocks and Hard Places: The Plight of Reinsurance Intermediaries Under U.S. and English Law*, 16 Mich. J. Int'l L. 485, 494 (1995); *Holmes*[7] § 105.2 at 213 ("That the reinsur-

---

[7]   Full cite at our footnote 4.

ance intermediary should be considered to be the ceding insurer's agent is consistent with the usual rule in the context of direct insurance."). The weight of authorities applies this principle. *See Aetna Ins. Co. v. Glens Falls Ins. Co.*, 453 F.2d 687, 690 (5th Cir. 1972) (holding that the intermediary was the agent of the reinsured.); *In re Pritchard & Baird, Inc.*, 8 B.R. 265 (D.N.J. 1980), *aff'd*, 673 F.2d 1301 (3rd Cir. 1981) (upholding the ruling of the bankruptcy court that Pritchard & Baird was the agent of ceding insurer (reinsured)); *Calvert Fire Ins. Co. v. Unigard Mut. Ins. Co.*, 526 F. Supp. 623, 638-39 (D. Neb. 1980), *aff'd*, 676 F.2d 707 (8th Cir. 1982) (holding that intermediaries were agents of the reinsured).

Here, there is not the slightest doubt that Stirling Cooke was acting for All American. WEB (an admitted agent of All American) authorized Stirling Cooke to place the Unicare retrocession on All American's behalf.[8] In fact, All American

---

[8] In determining that All American acted unreasonably in relying on EIU's apparent authority, the district court also discussed WEB's obligations. Specifically, it cited a Connecticut statute, Conn. Gen. Stat. § 38a-760f(a)(4)(K), which requires a licensed reinsurance-intermediary manager to keep written evidence that a reinsurer has delegated binding authority to its representative. Because WEB did not fulfill its statutory duty, the court held, All American cannot contend it reasonably relied on apparent authority. 303 F. Supp. 2d at 621. On appeal, All American contends, first, that Connecticut's act "does not create a private right of action." This argument mischaracterizes the relevance of the statute. Sphere Drake has not asserted any private right of action against WEB but merely points to the statute as evidence that WEB, and therefore All American, did not act reasonably and diligently in relying on EIU's apparent authority. Second, All American argues that the statute does not apply to WEB. Because it does not affect our decision, it is not necessary for us to resolve this dispute and delve into the intricacies of Connecticut insur-
(continued...)

admits that Stirling Cooke entered into and negotiated the retrocession for it, and it points to no evidentiary basis for finding that Stirling Cooke was not its agent. *See*, *e.g.*, *Petersen v. U.S. Reduction Co.*, 641 N.E.2d 845, 851 (Ill. App. Ct. 1994) ("Our courts have consistently stated that the distinguishing characteristic of an agent is that he represents another contractually. An agent, '[w]hen properly authorized, . . . makes contracts or other negotiations of a business nature on behalf of his principal . . . .'"). Because Stirling Cooke was acting as All American's agent, Stirling Cooke's lack of due diligence in determining the dollar amount limit on EIU's authority precludes a finding that apparent authority existed.

Because we hold that Sphere Drake did not consent or knowingly acquiesce to EIU's exercise of authority and that All American could not reasonably conclude that EIU was authorized to enter into the retrocession, it is unnecessary to also consider whether All American satisfies the detrimental reliance requirement for apparent authority.

Although EIU lacked both actual and apparent authority to bind Sphere Drake to the Unicare retrocession, All American argues the contract should still be enforced. It contends that by at least August 5, 1998, Sphere Drake knew that the premium limit had been exceeded. Nevertheless, Sphere Drake waited until March 1999 to rescind the retrocession. All American contends that this constitutes ratification of the retrocession or, in the alternative, waiver or estoppel of any right to repudiate the contract.

Where an agent acts without the authority to enter into a contract on the principal's behalf, the contract may still be ratified by the principal. "A principal can ratify his agent's actions either by not repudiating them or by accepting their

---

[8] (...continued)
ance law.

benefit." *Amcore Bank*, 759 N.E.2d at 185. Ratification requires "that the principal have full knowledge of the facts and the choice to either accept or reject the benefit of the transaction." *Id.* "Ratification may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an allegedly unauthorized transaction." *Stathis v. Geldermann, Inc.*, 692 N.E.2d 798, 808 (Ill. App. Ct. 1998). The important inquiry is whether Sphere Drake repudiated the contract within a "reasonable time." *See, e.g., Corn Belt Bank v. Lincoln Sav. & Loan Ass'n*, 456 N.E.2d 150, 159 (Ill. App. Ct. 1983).

Here, the May 1998 bordereau EIU provided to Sphere Drake prior to accepting the Unicare retrocession incorrectly indicated that EIU was still within the premium limits. Nevertheless, because of problems with an unrelated policy known as the "Versace claim," Sphere Drake decided to investigate EIU in the summer of 1998. On June 30, 1998 (one day after EIU agreed to the Unicare retrocession), Sphere Drake conducted an administrative audit of EIU underwriting. On July 28 and 29, 1998, Sphere Drake employees Michael Mather and John Coppinger conducted a more thorough audit. On August 5, 1998, they issued their report, concluding that through June 30, 1998, EIU had exceeded the $12 million premium limit for 1998. The report also indicated that EIU failed to adequately evaluate the risks and value of the retrocessions it received. Two days after receiving the report, on August 7, 1998, Watson informed Whitcombe that EIU needed to stop underwriting because the premium limit had been exceeded.

At that time, Sphere Drake did not take action to rescind any of retrocessions, however, because it did not consider the August 5, 1998, report conclusive. For example, as the district court noted, "as of August 1998, Sphere Drake did not yet have enough information to determine the order in which retrocession were accepted." As a result, it did not know which retrocession to rescind. In addition, Sphere

Drake wanted to further investigate EIU, including possible collusion between EIU and Stirling Cooke. Importantly, while conducting the investigation, Sphere Drake kept Stirling Cooke appraised of its concerns. On December 31, 1998, Sphere Drake notified Stirling Cooke that Sphere Drake was reserving its rights pending a review of the binding authority. Several days later, in a meeting on January 4, 1999, Sphere Drake further explained its concerns regarding the Unicare retrocession. All American's general counsel noted that by January 8, 1999, it knew that Sphere Drake had "taken issue with [EIU's] authority to place business" on its behalf.

Sphere Drake's investigation continued through March 1999. Robert Forness of Sphere Drake testified, "It took [Sphere Drake] at least a couple of months just to identify who had participated in various programs and to arrange visits to speak to them or to schedule audits. I don't believe even by October [1998] we had a full understanding of what had occurred. We were starting to put a picture together, but that's about how I would describe it." After conducting the investigation, on March 31, 1999, Sphere Drake formally repudiated the retrocession.

Considering this evidence, we agree with the district court that All American did not meet its burden of establishing ratification. All American's reliance on the August 5 report is insufficient. All that is established is that, beginning in June 1998 and continuing to the spring of 1999, Sphere Drake was involved in a reasonable investigation into EIU's actions. Such a circumstance does not rise to the level of ratification. *See, e.g.*, *Capital Dist. Physician's Health Plan v. O'Higgins*, 951 F. Supp. 352, 362 (N.D.N.Y. 1997), *vacated pursuant to settlement by* 1998 WL 340836199 (N.D.N.Y. Jan 8, 1998) ("Considering the surrounding facts, it seems patent that [plaintiff] was not ratifying an investment with full knowledge of the facts surrounding its purchase, but was rather collecting information on an

investment about which it entertained serious doubts"); *Bernstein v. Centaur Ins. Co.*, 644 F. Supp. 1361, 1370 (S.D.N.Y. 1986) ("The Court finds that Centaur initiated an investigation once the April Claims Report was received and repudiated the contract within a reasonable time thereafter."). As the district court held, Sphere Drake acted in a reasonable and timely manner in investigating the potential fraud before offering to return the premium.

All American also argues that Sphere Drake was at fault for failing to adequately monitor EIU's underwriting. All American's duty to reasonably and diligently inquire into whether EIU had authority to accept the retrocession "does not obviate" Sphere Drake's "own duty to third parties, which is to exercise reasonable diligence in monitoring its agents' activities so that they are not exceeding their authority." *Progress Printing Corp. v. Jane Byrne Political Comm.*, 601 N.E.2d 1055, 1067 (Ill. Ct. App. 1992). Although normally a principal's actual knowledge of the transaction is essential in determining ratification, "one whose ignorance or mistake was the result of gross or culpable negligence in failing to learn the facts will be estopped as if he had full knowledge of the facts." *Id.* at 1067-68 (quoting 18 Ill. Law & Prac. *Estoppel* § 23 at 84 (1956)). Here, evidence shows that Broad, Sphere Drake's underwriter in charge of the binding authority, was not particularly diligent in monitoring EIU. Indeed, Watson himself described Broad as a "seat of the pants underwriter," and Sphere Drake acknowledged in the UK trial that Broad "ought to have been far more cautious about granting the binder in the first place and more diligent in supervising its operation." Significantly, however, the latest bordereau that was provided to Sphere Drake (and Broad) showed, incorrectly, that the premium limit had not been exceeded. We agree with the district court that "[e]vents in this case show that a determination that the premium limit had been exceeded required an audit and

further investigation was needed to determine which retro-cessions were accepted after the limit was reached. The evidence does not support that Sphere Drake would have learned the limit had been exceeded if Broad had performed his duties in a reasonably diligent manner."

Finally, All American raises the related defenses of waiver and estoppel. It maintains that the delay in re-scinding should operate as a waiver of Sphere Drake's right to rescind or should otherwise estop Sphere Drake from denying the existence of a purported contract. For the same reasons we reject All American's ratification argument, we hold that the district court did not err in rejecting All American's waiver and estoppel claims.

Under Illinois law, "[e]stoppel arises only when a party's statement or conduct misleads another into the belief that a right will not be enforced and cause him to act to his detriment in reliance on that belief." *Old Security Life Ins. Co. v. Continental Ill. Nat'l Bank & Trust Co. of Chicago*, 740 F.2d 1384, 1392 (7th Cir. 1984). Here, All American cannot prove that it was misled into believing that Sphere Drake would not assert its right to repudiate the retro-cession. As the district court found, Sphere Drake acted in a reasonable and timely manner in investigating the potential fraud before offering to return the premium. And throughout this investigation it kept both Stirling Cooke and All American well-appraised and well-informed of the situation.

Likewise, in order to establish waiver, All American must show that Sphere Drake "clearly, unequivocally, and decisively" took action waiving the right. *Solow v. Northwest Airlines (In re Midway Airlines)*, 180 B.R. 851, 919-20 (Bankr. N.D. Ill. 1995). "Waiver of a contractual right is shown only when a party conducts itself in a manner which is wholly inconsistent with the clause or condition, thereby indicating its intent to abandon the con-

tractual right." *Id.* Here, Sphere Drake did not engage in any conduct that "clearly, unequivocally, and decisively" indicated its intent to waive its right to repudiate the retrocession. Sphere Drake reasonably conducted an investigation into EIU before repudiating the contract and as early as January 1999 indicated to All American of the possibility.

For the foregoing reasons, we agree that there are no material factual disputes and that the district court did not err in entering summary judgment for Sphere Drake. Because we decide the excess authority claim in Sphere Drake's favor, moreover, the case is over. Other than returning the premiums already paid, Sphere Drake is not liable on the Unicare retrocession. There is, therefore, no need to further litigate the fiduciary duty claim.

The judgment of the district court is AFFIRMED.


A true Copy:

        Teste:


                            _____
                            *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*