In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 14-2633

HANS-PETER BAUMEISTER,

*Plaintiff-Appellant,*

*v.*

DEUTSCHE LUFTHANSA, AG,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 780 — **Sharon Johnson Coleman**, *Judge.*

———————————

No. 14-2414

JAMES VARSAMIS & LAUREN MITCHELL VARSAMIS,

*Plaintiffs-Appellants,*

*v.*

IBERIA, LÍNEAS AÉREAS DE ESPAÑA, S.A. OPERADORA,
SOCIEDAD UNIPERSONAL,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 775 — **Thomas M. Durkin**, *Judge*.

———————————

ARGUED NOVEMBER 10, 2015— DECIDED FEBRUARY 2, 2016

———————————

Before POSNER, EASTERBROOK, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. It is not uncommon for the airline that sells the tickets for an international flight to arrange for another airline to provide service over part of the route. Sometimes that other airline--the bridge carrier, we'll call it—experiences delay in its segment of the flight, and if substantial the delay may entitle the passengers to damages. The question presented by these two appeals is in what circumstances the bridge carrier is liable for those damages, and in what circumstances the originating carrier, which sold the tickets, is liable. In both cases the plaintiffs sued on behalf of a class, but the suits were dismissed at the summary judgment stage before any classes were certified.

In the first case we discuss, plaintiff Baumeister had bought a ticket from Lufthansa for a pair of flights: from Stuttgart, his place of origin, to Munich, and then from Munich to San Francisco, his destination. The first flight was, as indicated on his itinerary, to be flown not by Lufthansa but by a regional German airline (since defunct) named Augsburg Airways. But that flight, the first leg of Baumeister's journey, was cancelled, and though Lufthansa arranged substitute air transportation for Baumeister from Stuttgart to

San Francisco he arrived more than 17 hours after he was originally scheduled to arrive.

A regulation of the European Union called EU 261 (officially "Regulation (EC) No. 261/2004 of the European Parliament and of the Council of 11 February 2004," unofficially the "Flight Delay Compensation Regulation," *Wikipedia*, https://en.wikipedia.org/wiki/Flight_Delay_Compensation_ Regulation (visited January 31, 2016)) specifies damages for certain cancelled or delayed flights into and out of the European Union. The regulation is enforced by administrative or judicial proceedings in nations that belong to the European Union. *Volodarskiy v. Delta Airlines, Inc.*, 784 F.3d 349, 352–57 (7th Cir. 2015). Baumeister tried that approach but failed, as we'll see, and so brought suit in a federal district court instead. Lufthansa's contract with its passengers—its General Conditions of Carriage—incorporates EU 261, and Baumeister argues that the airline is therefore contractually obligated to pay any damages that the regulation would impose were enforcement of it sought in the European Union. We'll assume for purposes of this appeal that Baumeister can indeed bring a breach of contract suit to enforce that regulation, although it can be questioned how a promise to abide by it could be enforced in U.S. courts given our holding in *Volodarskiy* that the regulation can be enforced only in European courts or agencies. But the parties haven't briefed the issue; nor would its resolution change the outcome of this appeal.

EU 261 states that "the obligations that [it] creates should rest with the operating air carrier who performs or intends to perform a flight," and moreover that "in case of cancellation of a flight, the passengers concerned shall … have the

right to compensation by the operating air carrier." Regulation 261/2004, 2004 O.J. (L 46) 1(EC) preamble, art. 5(1). Lufthansa argues that not it but Augsburg Airways was the operating carrier for the first leg of Baumeister's journey—Stuttgart to Munich. That's correct; his "itinerary receipt," issued by Lufthansa, states that the Stuttgart to Munich flight is to be "operated by Augsburg Airways," and according to the charter agreement between the two airlines this meant that on flights such as Baumeister's, Augsburg not only "own[ed] all aircraft deployed" but also was "responsible for the operational management of the aircraft deployed" and "provide[d] the necessary cockpit and cabin personnel for the operation of each agreed upon flight program." (Augsburg actually leased rather than owned many of its aircraft, but the German Federal Court of Justice has ruled that ownership versus lease is irrelevant to determining whether an airline is an operating carrier.) The regulatory body in Germany charged with enforcing EU 261 dismissed Baumeister's regulatory claim after Lufthansa's counsel notified it that Lufthansa had not operated the flight between Stuttgart and Munich.

In short, Baumeister cannot sue Lufthansa—or so at least the district judge found when granting Lufthansa's motion for summary judgment. But according to Baumeister the judge overlooked a provision in Lufthansa's General Conditions of Carriage which states that "if in case of a Code Share flight LH [i.e., Lufthansa] is indicated as the carrier these Conditions of Carriage also apply to such transportation. … For Code Share services on flights operated by another carrier, LH is responsible for the entirety of the Code Share journey for all obligations to Passengers established in these rules." A "Code Share" flight is defined in the General Con-

ditions of Carriage as "carriage by air which will be operated by another carrier as indicated in the ticket"—and so describes Baumeister's (cancelled) flight from Stuttgart to Munich; and he argues that this provision obligates Lufthansa to compensate him even though it wasn't the operating carrier. The kicker, however, is the phrase in the General Conditions that Lufthansa "is responsible for … all obligations to Passengers established in these rules." If a flight is cancelled, the Conditions require the airline to "offer assistance and compensation to the concerned passengers according to the Regulation EC 261/2004," which says that "the passengers concerned shall … have the right to compensation by the operating air carrier." EU 261 art. 5(1). This provision covers Baumeister's situation: a passenger affected adversely by the cancellation of a flight has a right to compensation from the operating carrier, which was Augsburg rather than Lufthansa.

Baumeister also argues, very weakly as it seems to us, that Augsburg was not a real operating carrier but merely a puppet of Lufthansa. Well, suppose Lufthansa was indeed pulling strings in the background. Still it was Augsburg that was scheduled to fly Baumeister to Munich. Augsburg was not a subsidiary of Lufthansa and one company cannot be sued in place of another just because they have a relationship of some sort. By way of comparison, we point out that Piedmont Airlines is a wholly owned subsidiary of American Airlines—does that mean that when one flies on Piedmont one really is flying on American, so that if Piedmont loses your baggage you can sue American? No, any more than if you find a defect in your IPhone 6S you can sue not Apple but Apple's shareholders, or its CEO, Tim Cook.

There is logic to EU 261 in placing liability on the operating carrier rather than on the carrier that issues the tickets. Often the cause of a delay is some error committed by the operating carrier—rarely, one imagines, is it the fault of the carrier that issued the ticket—and placing liability on the maker of the error is likely to have the salutary effect of causing him or it to be more careful the next time.

Enough about Baumeister's case. Our other case, *Varsamis v. Iberia* (as we'll call the carrier for the sake of brevity), is interestingly different. For the suit is not against the carrier that issued the tickets but against the operating carrier. Yet again the passenger plaintiffs lost in the district court.

The two plaintiffs in the case had bought roundtrip tickets from American Airlines: outbound from Dallas to Madrid to Venice and return from Rome to Madrid to Dallas, with the Rome to Madrid leg to be flown by Iberia Airlines. All was fine on the outbound journey, but on the return a delay of the Rome to Madrid flight caused the plaintiffs to miss their flight from Madrid to Dallas. Re-routed on a flight through Amsterdam, they arrived in Dallas almost 21 hours later than they'd been due to arrive. Suing like Baumeister in the Northern District of Illinois for compensation for the delay, they argued that American Airlines had been acting as Iberia's agent when it sold them their tickets and that Iberia was a party to a contract to fly them from Rome to Madrid. They point out that American's Conditions of Carriage provide that "American will act as an agent to issue tickets … for transportation via other carriers which have interline agreements with American. [Those] carriers may have different terms and conditions applicable to their flights."

The Varsamises point to a statement in American's International Tariff, also incorporated in the contract between the airline and the passengers, that "a carrier [American] issuing a ticket … for carriage over the lines of another carrier [Iberia] does so only as [its] agent." But this provision did not create a contract between Iberia and the Varsamises. The record does not make clear whether the quoted provisions of American's contract with the Varsamises applied to the flight from Rome to Madrid, but in any event American's statements could not bind Iberia: according to the Code Share agreement "neither party is intended to have, and neither of them shall represent to any other person that it has, any power, right or authority to bind the other … except as expressly required by this Agreement." The agreement specifies that "the Conditions of Carriage of the Marketing Carrier [American] … shall govern the transportation of Codeshared Passengers, and the Conditions of Carriage of the Operating Carrier [Iberia] … shall apply to those passengers traveling … under the Code of the Operating Carrier." Only when Iberia sold tickets on its flights were the ticket purchasers traveling under Iberia's code and governed by Iberia's conditions.

We said earlier that there is a practical logic to imposing liability for a flight delay on the carrier whose flight it was that was delayed (Iberia in this case). But the practical logic fails to carry the day for the Varsamises because they had no contract with Iberia. Their contract was with American.

Although Iberia was fully subject to EU 261 as the operating carrier, the Varsamises did not seek compensation from Iberia under that regulation in a European court or agency for the delay they experienced; nor do they argue that their

contract with American Airlines incorporates the regulation. They argue rather that they have a contract with Iberia and that it incorporates EU 261—which indeed is incorporated in Iberia's Conditions of Carriage—but the Varsamises had no contract with Iberia; the contract was with American Airlines. American had a contract with Iberia that entitled American to sell tickets for specific seats on Iberia's flights and also to affix an American flight number to those flights, pursuant to the two airlines' code-sharing arrangement— "an arrangement whereby a carrier's designator code is used to identify a flight operated by another carrier." 14 C.F.R. § 257.3(c). A block of seats (including the Varsamises') was thereby reserved for American customers, the price of those seats was set by American, and the profit or loss was incurred by American. The application submitted jointly by American and Iberia to the U.S. Department of Transportation for approval of their code-sharing arrangement was approved with the condition that "the carrier selling such transportation (i.e., the carrier shown on the ticket) accept[s] responsibility for the entirety of the code share journey for all obligations established in its contract of carriage with the passenger; and that the passenger liability of the operating carrier [will] be unaffected." The Department's approval of the code-sharing agreement was thus conditioned on the marketing carrier's acceptance of that responsibility. That was American Airlines, so the Department was requiring it to contract with, and take full responsibility for, the codeshare passengers.

Although the Varsamises say they thought they had a contract with Iberia because they checked in for their Rome to Madrid flight with Iberia and were rerouted with the help of Iberia employees after the flight was delayed, Iberia of-

fered these services pursuant to its code-sharing agreement with American, which provides that "in the event of any flight cancellation or other schedule irregularity … with respect to a Codeshared Flight, the Operating Carrier shall … at its own cost and expense, accommodate and/or pay denied boarding compensation or otherwise compensate Codeshared Passengers." Having agreed with American that "the Conditions of Carriage of the Marketing Carrier [American], including its limits of liability to passengers, shall govern the transportation of Codeshared Passengers," Iberia was complying with its contractual obligations to American, not to the Varsamises, in helping them cope with the delay in their return trip to the United States.

The Varsamises argue in the alternative that the doctrine of apparent authority establishes that they had a contract with Iberia. Under Illinois law, which both parties agree governs this diversity suit, "apparent authority arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf." *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 577 N.E.2d 1344, 1349–50 (Ill. App. 1991). Thus "only the words and conduct of the alleged principal, not the alleged agent, establish the authority of an agent." *C.A.M. Affiliates, Inc. v. First American Title Ins. Co.*, 715 N.E.2d 778, 783 (Ill. App. 1999). The Varsamises claim that their contract with American led them to believe that American was acting as Iberia's agent because American's Conditions of Carriage refer to other carriers' terms and conditions. Those references may just be to interline agreements. In any event Iberia did nothing to create an impression that American was authorized to create a contract be-

tween Iberia and the Varsamises. The Varsamises could have sued Iberia in Europe for violation of EU 261, but did not.

Alternatively the Varsamises invoke ratification of an unauthorized agent's making an agreement on behalf of the principal. See *Sphere Drake Ins. Ltd. v. American General Life Ins. Co.*, 376 F.3d 664, 677 (7th Cir. 2004). But Iberia did not ratify any contract with the Varsamises.

The judgments in both cases are

AFFIRMED.