No. 2--00--1462

IN THE 

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

AMCORE BANK, N.A., ROCK RIVER VALLEY, ) Appeal from the Circuit Court 

n/k/a Amcore Bank, N.A., ) 
of Lee County.

)

Plaintiff-Appellant, ) 

) 

v. ) 
No. 97--L--15
 

) 

HAHNAMAN-ALBRECHT, INC., DEAN         ) 

HAMILTON, JEFFREY HAMILTON, DAVID VON ) 

HOLTEN, and PAUL A. RITTMANIC, )

)

Defendants )

)

(Grand Premier Trust and Investment, )

Inc., as 
Trustee
 of the Thomas F. ) 
 Honorable

Conley 
Trust
 dated September 1, 1988, ) 
David T. Fritts,
 

Defendant-Appellee). ) 
Judge, Presiding.

JUSTICE CALLUM delivered the opinion of the court:

Plaintiff, Amcore Bank, N.A., lent 
$17 million
 to defendant, Hahnaman-Albrecht, Inc. (HAI).  When HAI defaulted on the loan, plaintiff sued HAI and the individual guarantors, Dean Hamilton, Jeffrey Hamilton, Thomas Conley, David Von Holten, and Paul Rittmanic.  Grand Premier Trust and Investment, Inc., as trustee of the Thomas F. Conley trust dated September 1, 1988, was substituted for Conley when he died.  Conley's guaranty had been signed by his son, Kristopher, pursuant to a durable power of attorney.  Grand Premier argued that the guaranty was invalid because Kristopher did not have the authority to sign it.  Following an evidentiary hearing, the trial court entered judgment for Grand Premier and found no just reason to delay enforcement or appeal (155 Ill. 2d R. 304(a)).  

Plaintiff appeals, arguing that the trial court erred in (1) failing to find that plaintiff acted in good faith in relying on the power of attorney; (2) concluding that the power of attorney did not authorize Kristopher to sign guaranties; and (3) failing to find that Grand Premier ratified the guaranty.  We affirm.

BACKGROUND

Thomas Conley, Dean Hamilton, and Paul Rittmanic were the original founders and shareholders of Hahnaman Elevator.  In 1984, Hahnaman Elevator merged with Albrecht Grain Company and became HAI. In August 1994, Conley (via his trust), Dean Hamilton, and Rittmanic each owned 19½% of HAI.

HAI began borrowing funds from First Bank South in 1986.  First Bank South required Conley, Dean Hamilton, and Rittmanic to guaranty the loans.  Conley guarantied the debt from 1986 to 1994.  On May 1, 1993, Conley guarantied to First Bank South a final loan of $8 million.  Conley's net worth was greater than Rittmanic's or Dean Hamilton's, and his guaranty was important to First Bank South.

Conley was diagnosed with Parkinson's disease in the mid-1970s.  In the early 1990s, Conley's illness was causing him to suffer from dementia.  By 1992, he was becoming increasingly confused about his surroundings.  By late 1993 and early 1994, Conley would wander off and get lost, and his wife purchased an identification bracelet for him to wear.  On April 18, 1994, Conley and his wife went to First Bank South to sign loan renewals.  Jill Flickinger, an officer at the bank, testified that Conley signed the documents with his wife's help, but he did not appear to understand what he was being told.

In 1988, Conley created a trust entitled "Thomas F. Conley Trust dated September 1, 1988."  Conley was the trustee, and First Bank South (
defendant Grand Premier
's corporate predecessor) was authorized to succeed him as trustee if he became unable to handle his own affairs.  The trust gave the trustee the power to pledge trust assets for the debts of any business in which Conley held at least a 5% interest.  On the same day that he created the trust, Conley executed a durable power of attorney that named his wife, Joanne, as attorney-in-fact.

In 1992, Conley's attorney, Philip Ward, prepared another durable power of attorney for Conley.  This one named both Kristopher and Joanne Conley as attorneys-in-fact and was meant to replace the 1988 power of attorney.  The form was the standard power of attorney used by Ward's office.  Conley executed this document in October 1992.  A draft of the document had been sent to him in June 1992.  At that time, Ward sent the Conley family a letter explaining that the power of attorney was very broad, "but not broad enough to allow the attorney in fact to continue any 'guarantee' program in your business transactions.  Those decisions I believe should be made only by Tom alone."  Ward testified that he believed at the time that the power of attorney did not authorize the attorneys-in-fact to guaranty HAI's loans.  Ward also testified that the power of attorney was not intended to change the trust provision giving the trustee the authority to pledge trust assets to support HAI's debts.

Conley had an estate planning meeting in November 1992.  The meeting was attended by Conley, John Nagy (his accountant), Joanne and Kristopher Conley, Steve Flahaven (the former senior vice president of First Bank South), Flickinger, and Ken Urban (a Grand Premier employee).  At this meeting, Conley expressed a desire to retain his interest in HAI under certain conditions.  He did not mention whether he wished to continue to guaranty HAI's debts.  The parties discussed setting up an investment committee to handle Conley's investments in HAI.  Nagy, Ward, and Flahaven were suggested as committee members.  No one suggested that Kristopher should be on the committee. 

In January 1993, the trust was amended.  The grant of authority to the trustee was changed in certain respects, but the trustee's authority to pledge trust assets to support Conley's business debts was not altered.  The amendment stated Conley's preference for retaining his HAI shares as long as his friends were involved in the company.  However, it cautioned that Conley did not wish to invest further in HAI, even if his share decreased.  
Eventually, it became clear that an investment committee could not be formed because of conflicts of interests.  That December, Joanne, Kristopher, and Kristopher's sisters discussed having an advisor to the trustee instead.  They determined that Kristopher should act in that capacity.
  Kristopher was appointed advisor to the successor trustee, with the power to vote family securities and to veto their sale.  Kristopher testified that the role of advisor was emasculated to the point that there was very little the advisor could do.

On July 25, 1994, Flickinger mailed Conley a letter stating that Grand Premier was replacing him as trustee of the Conley Trust.  According to Flickinger, Grand Premier stepped in because she had no doubt that Conley was under a disability that prevented him from acting as trustee.  Conley was admitted to a nursing home in November 1994 and died in 1999.

In January 1994, HAI was looking for a new bank.  HAI wanted an operating line of credit for its grain storage and fertilizer sale operation.  Representatives of HAI met with Gordon Monn, a commercial relationship officer for plaintiff.  Plaintiff required that the loan be guarantied by Conley, Dean Hamilton, Jeff Hamilton, Rittmanic, and Von Holten.  During the loan negotiations, plaintiff was informed that Conley was unable to sign the guaranty and that his guaranty would be signed by his son, Kristopher, pursuant to a durable power of attorney.

Monn called Ward to ask him whether the power of attorney gave Kristopher the authority to sign the guaranty.  Ward told Monn that the power of attorney would allow either Joanne or Kristopher to sign the guaranty.  Ward based his opinion on the broad grant of authority in the first two paragraphs:

"I, THOMAS CONLEY, *** hereby appoint *** my wife JOANNE CONLEY, and my son, KRISTOPHER CONLEY, each individually and not jointly, my attorney-in-fact (herinafter referred to as 'my agent') for me and in my name, to perform for  
me every act of every kind and nature which may be deemed desirable or advisable to be performed for me.

Without in any way limiting the general power herein given, I hereinafter specify particular powers which I intend to be given as part of and not a limitation of the above general powers."

After speaking with Ward, Monn prepared a memorandum for the HAI file in which he recorded his understanding of Ward's opinion.  In this memorandum, Monn stated that Ward had researched the issue and concluded that the power of attorney would allow Kristopher to sign the guaranty and that, in Ward's opinion, the power of attorney could not be contested in court.  However, Ward had emphasized that he represented the Conleys and that Monn should seek the advice of plaintiff's own counsel.  Monn and Ward did not discuss the Conley Trust or the trustee's ability to execute guaranties.

After speaking with Ward, Monn called one of plaintiff's attorneys, John Miller, and asked him to contact Ward to confirm what Ward had told Monn.  At that time, Miller was also plaintiff's chairman of the board and a member of its executive and loan committees.  Monn testified that he contacted Miller because he knew that Ward represented the Conleys, and Monn wanted one of plaintiff's own attorneys to review the matter.  Miller contacted Ward, and Ward told him that he believed that the power of attorney authorized the attorney-in-fact to sign and bind the trust assets.  This conversation lasted approximately five minutes.  Although Ward told Miller that the power to bind trust assets could be delegated, he did not provide any reasons or legal authority for his opinion.

Miller testified that Monn asked him to research whether Kristopher could sign on behalf of Conley as trustee.  Miller 
was not shown the loan documents
 and did not realize that Kristopher was signing a guaranty.  Miller acknowledged at trial that a third person may not assume from the mere fact of agency that the agent has the authority to make contracts of guaranty.  Miller testified that he researched whether an agent could be delegated the authority to bind trust assets, not whether a guaranty could be executed pursuant to a general grant of agency in a power of attorney.

Miller ultimately reported to Monn that his own research was inconclusive.  Miller told Monn that, if plaintiff relied on Kristopher's authority as attorney-in-fact, plaintiff would end up in litigation attempting to recover against the trust.  Monn did not ask Miller what he believed the outcome of such litigation would be, nor did Monn ask Miller to do further research.

When Monn spoke to Ward and Miller, he had already recommended the HAI credit to plaintiff's lending committee.  The committee approved the loan approximately one month before Monn telephoned Ward.  After Monn received Miller's opinion, he moved ahead to documentation of the loan.

Plaintiff and HAI entered into the revolving credit agreement on August 30, 1994.
  At the closing, plaintiff received an opinion letter from attorney Ronald Baird, who represented HAI.  Baird wrote that the guaranties were "the legal, valid, and binding obligations of the respective Guarantors enforceable against the guarantors in accordance with their terms."

Plaintiff and HAI later renewed the line of credit.  In August 1995, the line of credit was split into two notes, one for $2 million and one for $15 million.  Kristopher again signed on his father's behalf, pursuant to the durable power of attorney.  Kristopher also used the power of attorney to sign amendments to the revolving credit agreement.

The trial court heard evidence of another loan guaranty that Kristopher signed pursuant to the power of attorney.  In 1994, HAI sought to increase its long-term line of credit 
from $3 million to $5.5 million
 and began negotiating with Metropolitan Life (MetLife) for a long-term loan.  MetLife required the personal guaranties of Conley, Dean Hamilton, Jeff Hamilton, Von Holten, and Rittmanic.  When MetLife questioned Kristopher's authority to sign under the power of attorney, Baird researched the issue.  He sent MetLife a letter referencing the provision of the power of attorney authorizing the agent to sue a party who refuses to recognize the power of attorney.  Baird also said he was attaching authority that might help MetLife approve of Kristopher's use of the power of attorney.  The authority was a photocopied page from American Jurisprudence, with two footnotes starred.  The footnotes were brief case synopses of a Utah Case and a New York case dealing with the implied authority of an agent.  This was the result of a 15-minute research project.  Baird also provided MetLife with an opinion letter stating that the power of attorney was still in effect and that the guaranties were the "legal, valid, and binding obligation of the guarantors."  Monn reviewed the MetLife loan documents in connection with plaintiff's loan to HAI.

In 1997, HAI defaulted on the loan from plaintiff, and plaintiff sued HAI and the individual guarantors.  In the ensuing litigation, Grand Premier asserted that the Conley guaranty was invalid because the power of attorney did not give Kristopher the authority to sign guaranties.  The trial court entered judgment for Grand Premier.  The court found that Kristopher did not have express, implied, or apparent authority to execute guaranties on the trust's behalf.  The court further found that plaintiff did not act in good faith in relying on the power of attorney and that neither Conley nor the Conley trust ratified Kristopher's actions.

ANALYSIS

Before proceeding to the merits of plaintiff's appeal, we address a motion that we took with the case.  Plaintiff moved to strike the statement of facts in Grand Premier's brief because it was argumentative
 and contained statements unsupported by citations to the record.  Grand Premier, as the appellee, was not required to include a statement of facts in its brief.  177 Ill. 2d R. 341(f).  It chose to do so, however, and therefore should have complied with Supreme Court Rule 341(e)(6) (177 Ill. 2d R. 341(e)(6)), which requires that facts be stated "accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal."

Grand Premier's statement of facts contains several violations of Rule 341(e)(6).
 Nevertheless, we find it unnecessary to strike Grand Premier's statement of facts.  Where violations of supreme court rules are not so flagrant as to hinder or preclude review, the striking of a brief in whole or in part may be unwarranted.  
Cottrill v. Russell
, 253 Ill. App. 3d 934, 938 (1993).  Grand Premier's rules violations are not so flagrant as to hinder our review, and therefore we will merely disregard the improper portions of the statement of facts. 

 We address plaintiff's arguments in an order different from that in which they are raised.  We consider first whether the durable power of attorney gave Kristopher the authority to execute guaranties.  Next, we consider whether plaintiff's good-faith reliance would protect it pursuant to the Illinois Power of Attorney Act (the Act) (755 ILCS 45/1--1 
et
 
seq
. (West 2000)).  Finally, we consider  whether Grand Premier ratified Kristopher's execution of the guaranty.

I. Agency

An agency is a fiduciary relationship in which the principal has the right to control the agent's conduct and the agent has the power to act on the principal's behalf.  
Letsos v. Century 21-New West Realty
, 285 Ill. App. 3d 1056, 1064 (1996).  An agent's authority may be either actual or apparent, and 
actual authority may be either express or implied.
  
C.A.M. Affiliates, Inc. v. First American Title Insurance Co.
, 306 Ill. App. 3d 1015, 1021 (1999).  
Only the alleged principal's words and conduct, not those of the alleged agent, establish the agent's authority.  
First American Title Insurance Co. v. TCF Bank, F.A.
, 286 Ill. App. 3d 268, 274 (1997).

The party alleging an agency relationship must prove it by a preponderance of the evidence.  
Granite Properties Limited Partnership v. Granite Investment Co.
, 220 Ill. App. 3d 711, 714 (1991).  Whether an agency relationship exists and the scope of the purported agent's authority are questions of fact. 
Progress Printing Corp. v. Jane Byrne Political Committee
, 235 Ill. App. 3d 292, 306 (1992).
  Consequently, we will reverse the trial court's findings on these issues only if they are against the manifest weight of the evidence.  
Progress Printing
, 235 Ill. App. 3d at 306.
  A finding is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the finding appears to be unreasonable, arbitrary, or not based on the evidence.  
Bazydlo v. Volant
, 164 Ill. 2d 207, 215 (1995).

A. Actual Authority

1. Express Authority

We consider first whether Kristopher had actual authority, either express or implied, to sign the guaranty on behalf of the Conley trust.  An agent has express authority when the principal explicitly grants the agent the authority to perform a particular act.  
C.A.M. Affiliates, Inc.
, 306 Ill. App. 3d at 1021.  Here, the evidence is clear that Conley never explicitly gave Kristopher the authority to sign guaranties on his trust's behalf.  The power of attorney lists specific powers given to the attorneys-in-fact, and the power to execute guaranties is not among them.  Further, when Conley executed the power of attorney, his attorney assured him that it was not broad enough to authorize the attorneys-in-fact to continue any guaranty programs in his business transactions.
  Additionally, he specifically gave his trustee the power to pledge trust assets for his business debts.  

Plaintiff relies solely on the broad grant of agency in the power of attorney's opening paragraph, in which the attorneys-in-fact are given the 
authority to perform "every act of every kind and nature which may be deemed desirable or advisable to be performed for [Conley]."
  However, a broad "catchall" provision in a power of attorney does not generally expand specifically limited powers absent clear evidence of the principal's contrary intent.  
In re Guardianship of Mabry
, 281 Ill. App. 3d 76, 84 (1996).  We find instructive the following passage from 
Fort Dearborn Life Insurance Co. v. Holcomb
, 316 Ill. App. 3d 485, 499 (2000):

"A written power of attorney must be strictly construed so as to reflect the 'clear and obvious intent of the parties.' [Citations.] Thus, even if we construe the power of attorney as 'durable' under Article II, we believe the holding in 
In re Guardianship of Mabry
, 281 Ill. App. 3d 76 (1996), would still be applicable.  
No matter how the power is characterized, a 'catchall' provision will not operate to expand powers expressly limited in other portions of the same instrument.  See Restatement (Second) of Agency §37, Comment 
a
, at 128 (1958) ('[W]here general terms are used which literally purport to grant great authority, such terms will normally be interpreted as authorizing the agent to act only in connection with the business the agent is employed to perform');  see also Restatement (Second) of Agency §34, Comment 
h
, at 122 (1958) ('[When interpreting powers of attorney] all-embracing expressions are discounted or discarded.  Thus, phrases like "as sufficiently in all respects as we ourselves could do personally in the premises" *** are disregarded as meaningless verbiage').
"

Nevertheless, even if the broad grant of agency in the opening paragraph was legally effective, it remains subject to a long-standing principle of agency law: that a general grant of agency does not carry with it the power to execute guaranties.  As stated in 
Corpus
 
Juris
 
Secundum
, "there is no implication of such authority [to make a contract of guaranty] from a general agency of any kind," and "[a] third person may not assume from the mere fact of agency, either limited or general, that [the agent] has authority to make a contract of guaranty." 2A C.J.S. 
Agency
 §181 (1972); see also 
Braun v. S.F. Hess & Co.
, 187 Ill. 283, 287 (1900) (authority to make contract of guarantee not implied in general agency); 12 R. Lord, Williston on Contracts  §35.18, at 246-47 (4th ed. 1999) ("However general the character of the agency may be, a contract of guaranty or suretyship is not normally to be inferred from such an agency").

The evidence is clear that Conley never expressly gave Kristopher the power to sign guaranties of HAI debt.  He gave this power to his trustee, and his attorney told him that the power of attorney did not authorize the attorneys-in-fact to execute guaranties.  Further, the general grant of agency in the power of attorney's catchall paragraph did not carry with it the authority to make contracts of guaranty.  Accordingly, the trial court's finding of no express authority was not against the manifest weight of the evidence.

2. Implied Authority

Actual authority may also be implied.  Implied authority is authority that is inherent in an agent's position.  
Progress Printing
, 235 Ill. App. 3d at 308.  Such authority is proved by circumstantial evidence.  
Granite Properties
, 220 Ill. App. 3d at 714.  

The trial court's finding that Kristopher had no implied authority to sign guaranties was not against the manifest weight of the evidence.  As set forth above, the power of attorney did not expressly give Kristopher the power to execute guaranties, and the circumstantial evidence shows that Conley did not intend Kristopher to have that authority.  Further, plaintiff has not referred to any express power in the power of attorney that carried with it by necessary implication the power to execute guaranties.

Plaintiff claims that implied authority was established by (1) Conley's desire to retain his investment in HAI; (2) Conley's previous guaranties of HAI's debt and the fact that his guaranty was always essential to the lender; (3) Kristopher's background and his relationship with his father; (4) Ward's expressed opinion to Kristopher that he had the authority to sign the guaranties; and (5) Kristopher's execution of the MetLife guaranty.  We fail to see how these factors are related to implied authority.

As we stated, implied authority is merely actual authority proved by circumstantial evidence or authority that is inherent in an agent's position.  The relevant evidence shows that Conley gave the power to execute guaranties to his trust and not to Kristopher.  He was told that the power of attorney did not convey the power to execute guaranties, and there is simply nothing in the evidence to suggest that he wanted Kristopher to have this power.  Further, as the trial court noted, Conley had given Kristopher control over some of his investments, but not his HAI investment.  Also, Conley expressed that, although he wished to retain his HAI investment, he did not want the trustee to invest further in HAI even if his share would be lessened.  The trial court's finding of no implied authority was not against the manifest weight of the evidence.

B. Apparent Authority

Plaintiff further argues that Kristopher had the apparent authority to execute guaranties.  A principal is bound equally by the authority that he actually gives his agent and by that he appears to give.  
Lynch v. Board of Education of Collinsville Community Unit District No. 10
, 82 Ill. 2d 415, 426 (1980).  An apparent agent is one who, 
because of the manifestations of another
, reasonably appears to third persons to be authorized to act as the other's agent.  
Lynch
, 82 Ill. 2d at 426.  To prove apparent authority, the proponent must show that (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal; and (3) the third person justifiably and detrimentally relied on the agent's apparent authority.  
Letsos
, 285 Ill. App. 3d at 1065.

No extended discussion of this issue is necessary because plaintiff cannot meet the first prong.  There is simply no evidence that Conley ever consented to or knowingly acquiesced in Kristopher's signing guaranties.  Only the words and conduct of the alleged principal, not the alleged agent, establish the agent's authority (
C.A.M. Affiliates, Inc.
, 306 Ill. App. 3d at 1021), and apparent authority arises when a 
principal
, through words or conduct, creates a reasonable impression that the agent has the authority to perform a certain act (
Granite Properties
, 220 Ill. App. 3d at 714).

Plaintiff has pointed to no actions by Conley that would have led it to conclude that Kristopher had the authority to sign guaranties on behalf of Conley's trust.  Conley was incapacitated at the time of the transaction, but his prior actions showed an unmistakable intent to give the authority to his trustee and not to Kristopher.  Monn was aware that Conley was disabled and that his assets were held in trust, yet Monn never asked to look at the trust documents nor asked the trustee to sign the guaranty.  

Plaintiff argues that Ward was also Conley's agent and that plaintiff was entitled to rely on Ward's comments to Monn about the power of attorney's scope.  The evidence shows, however, that Conley was disabled when Ward made these statements.  Because Ward's agency was not durable, his authority to act for Conley expired when Conley became incapacitated.  See Restatment (Second) of Agency §122 (1958) (principal's loss of capacity generally terminates the agency); 2A C.J.S. 
Agency
 §141 (1972)(because principal has a right of supervision over the agency, his mental incapacity terminates the agency).  Thus, Ward's statements did not constitute consent or acquiescence on Conley's behalf.  The trial court's finding that Conley did not create apparent authority in Kristopher to sign guaranties was not against the manifest weight of the evidence.

II. Good Faith

Plaintiff argues that it should be protected because it relied in good faith on the durable power of attorney.  Plaintiff relies on section 2--8 of the Act (755 ILCS 45/2--8 (West 2000)), which provides, in part, as follows:

"Any person who acts in good faith reliance on a copy of a document purporting to establish an agency will be fully protected and released to the same extent as though the reliant had dealt directly with the principal as a fully-competent person." 

The trial court found that plaintiff did not act in good faith because its own attorney told Monn that litigation would result if plaintiff tried to rely on the power of attorney.

Grand Premier asserts that whether plaintiff acted in good faith is a red herring because the statute applies 
only
 if an agency is created in the first place.  As Grand Premier points out, the Appellate Court, First District, has construed section 2--8 to require an agency to exist before a party may claim good-faith reliance on it.  
In re Estate of Davis
, 260 Ill. App. 3d 525, 528 (1994)
.  Grand Premier does not mention, however, that 
Davis
 was construing an earlier version of section 2--8 and that the legislature has since overruled 
Davis
 by amending the statute.

Section 2--8 previously began, 
"Any person who acts in good faith reliance on a 
copy of the agency
 will be fully protected and released to the same extent as though the reliant had dealt directly with the principal as a fully-competent person."
  (Emphasis added.) 755 ILCS 45/2--8 (West 1996).  
In 
Davis
, a bank had relied on a forged power of attorney in transferring funds from Davis's account to her nephew's.  The bank invoked section 2--8, but the court held that, because the document was forged, Davis's nephew was not actually her agent and therefore the bank's good-faith reliance was irrelevant.  
Davis
, 260 Ill. App. 3d at 528-29.

The legislature subsequently amended the opening clause of section 2--8, which now reads, "
Any person who acts in good faith reliance on a copy of a document 
purporting to establish an agency
 will be fully protected ***
."  (Emphasis added.) 755 ILCS 45/2--8 (West 2000).  This change was part of Public Act 90--21, which took effect on June 20, 1997.  When the bill was read in the Senate, Senator Dillard stated:

"This bill comes from the Illinois Community Bankers' Association and it's also supported by the Illinois Bankers' Association and the Chicago Bar Association.  And it is in response to a 1st District Appellate Court Case which held that a bank relying on a forged power of attorney document was not protected by the Power of Attorney Act.  It also makes various changes clarifying that the reliance is valid based on dealings with named agents and principals, and this protects persons who are acting in good faith but are being fraudulently presented with invalid power of attorney documents.  And again, it comes from the Illinois Community Bankers and is -- as a response to a 1st District Case."  90th Ill. Gen. Assem., Senate Proceedings, May 9, 1997, at 91 (statements of Senator Dillard).

Thus, the outcome of 
Davis
 would be different under the new statute because the forged power of attorney purported to give the agent authority.  

Here, although the trial court relied on the prior statute, the result is the same under either version.  Just as the power of attorney did not actually give Kristopher the authority to execute guaranties, it did not 
purport
 to do so either.  If the power of attorney stated that it gave Kristopher the authority to execute guaranties but was invalid for some other reason, plaintiff's good-faith reliance would protect it.  However, the power of attorney did not purport to give Kristopher that power and plaintiff cannot claim good-faith reliance.

III. Ratification

Finally, plaintiff argues that the trial court erred in finding that Grand Premier did not ratify Kristopher’s execution of the guaranty.  A principal can ratify his agent’s actions either by not repudiating them or by accepting their benefit.  
Athanas v. City of Lake Forest
, 276 Ill. App. 3d 48, 57 (1995).
  A ratification requires that the principal have full knowledge of the facts and the choice to either accept or reject the benefit of the transaction.  
Lydon v. Eagle Food Centers, Inc.
, 297 Ill. App. 3d 90, 95-96 (1998).  
Plaintiff argues that Grand Premier ratified Kristopher’s execution of the guaranty by (1) advancing funds to Kristopher to partially pay the MetLife liability; (2) accepting a dividend payment from HAI in 1995; and (3) not repudiating the guaranty.

Scant evidence was introduced on this issue, and plaintiff appears to have raised this argument as an afterthought in the trial court.  In its response to Grand Premier’s trial memorandum plaintiff stated that "[t]he ratification argument was not raised by [plaintiff] in its Trial Memorandum ***.  However, assuming for the sake of argument that ratification is an issue, [plaintiff] will address it ***." 

On appeal, plaintiff has not demonstrated that the trial court’s judgment on this issue was against the manifest weight of the evidence.  Indeed, plaintiff merely states that it is "arguable" that Grand Premier ratified Kristopher’s execution of the guaranty.  Plaintiff does not explain how an opposite conclusion is clearly apparent or why the finding is unreasonable, arbitrary, or not based on the evidence.

Also, plaintiff has not presented this court with any authority that Grand Premier 
could
 ratify Kristopher’s actions.  Kristopher was his father’s agent for certain purposes; he was not Grand Premier’s agent.  As plaintiff acknowledges, only a principal can ratify his agent’s actions.  Absent any legal authority or evidence that Kristopher was Grand Premier’s agent, we cannot say that the trial court’s finding that Grand Premier did not ratify Kristopher’s actions was against the manifest weight of the evidence.

CONCLUSION

Plaintiff has failed to demonstrate that the trial court’s judgment was against the manifest weight of the evidence.  Accordingly, we affirm the judgment of the circuit court of Lee County.

Affirmed.

RAPP and BYRNE, JJ., concur.