# Illinois Official Reports

## Appellate Court

---

### *Arris Group, Inc. v. CyberPower Systems (USA), Inc.*, 2021 IL App (1st) 191850

---

| | |
|---|---|
| Appellate Court Caption | ARRIS GROUP, INC., Plaintiff-Appellee, v. CYBERPOWER SYSTEMS (USA), INC., and CYBERPOWER SYSTEMS, INC., Defendants-Appellants. |
| District & No. | First District, Fifth Division<br>Nos. 1-19-1850, 1-20-0241 cons. |
| Filed | November 12, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2013-L-013175; the Hon. Margaret A. Brennan, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded. |
| Counsel on Appeal | Kevin M. Forde and Joanne R. Driscoll, of Forde & O'Meara LLP, of Chicago, for appellants.<br><br>Mark P. Miller, Mark L. Durbin, Lindsey D.G. Dates, and Dana Amato Sarros, of Barnes & Thornburg, LLP, of Chicago, for appellee. |

Panel JUSTICE CONNORS delivered the judgment of the court, with opinion.

Presiding Justice Delort and Justice Hoffman concurred in the judgment and opinion.

## OPINION

¶ 1  Defendant, CyberPower Systems (USA), Inc. (CyberPower USA), executed a corporate supply agreement (CSA) with Motorola, Inc. (Motorola), which was a predecessor of plaintiff, Arris Group, Inc. (Arris). The subject of the CSA was a battery backup unit (BBU) that Motorola bought from CyberPower USA and placed in a module that was later sold to Verizon. In a separate transaction, the BBUs were also sold to Tellabs, which were in turn supplied to Verizon as well.[1] Verizon claimed that the BBUs malfunctioned, resulting in a $12.56 million settlement between Arris and Verizon. Arris sought indemnity under the CSA from CyberPower USA and its parent company, CyberPower Systems, Inc. (CP Taiwan). CyberPower USA and CP Taiwan (collectively, the CyberPower defendants) refused and a lawsuit ensued. After the parties filed cross-motions for summary judgment, the circuit court granted summary judgment to Arris, entered judgment against the CyberPower defendants, and ordered them to pay Arris $12.56 million in damages and over $3 million in prejudgment interest. On appeal, the CyberPower defendants seek reversal on the grounds that (1) a time-limited warranty applied to Arris's claim for indemnity, (2) the award of $12.56 million in damages was unreasonable, (3) prejudgment interest was improperly awarded, and (4) CP Taiwan was not liable. Because there is a question of material fact about whether CP Taiwan is liable under the CSA, we affirm in part, reverse in part, and remand for further proceedings.

¶ 2           I. BACKGROUND

¶ 3       A. Agreements and the Amended Complaint

¶ 4  The CSA was dated June 1, 2007, and signed by a representative of Motorola and the president of CyberPower USA as "Supplier." Section 1.1 of the CSA stated that "Supplier" included:

> "[A]ll entities of each respective Party that control, are controlled by, or are under common control with, that Party. An entity 'controls' another entity when it owns more than fifty percent of the voting stock or other ownership interest of that entity or has the ability to direct its management."

Section 11.2 of the CSA stated:

> "Supplier will fully defend, indemnify, and hold harmless Motorola and all of its past, present, and future affiliates, *** successors, [and] assigns *** (the 'Motorola Indemnitees') against all Claims brought by a third party under any theory of liability or recovery, arising from, or connected with, Supplier's acts or omissions under this Agreement, or the acts or omissions of the Supplier's past, present, or future offices, directors, employees, contractors, representatives, or agents under this Agreement,

---

[1]Neither Verizon nor Tellabs are parties in this litigation.

including without limitation the delivery of Products that are defective, non-conforming, or that otherwise fail to comply with Supplier's warranties as set forth in this Agreement. Supplier will reimburse the Motorola Indemnitees for all losses, costs, and expenses the Motorola Indemnitees incur as a result of such Claims, including court costs and attorneys' fees."

Section 6.4 of the CSA stated:

"Supplier represents and warrants that each Product is free of any defect that would pose a potential safety hazard. Further, unless specified otherwise in the applicable Product Schedule, for a period of thirty (30) months from the date of Product Delivery or for the period of Supplier's standard warranty, whichever is longer, Supplier expressly warrants that all Products are free from defects in design, materials, and workmanship, *** and conform to the Product specifications."

¶ 5    Arris filed an amended complaint on April 9, 2014, which stated in part as follows. In 2011, Verizon received reports of failing modules. After Hurricane Sandy caused power outages in 2012, Verizon received reports of thousands of failed modules, the cause of which was traced to the failure of the BBUs. Arris alleged that the BBUs did not conform to applicable product specifications and were found to contain a design defect that caused the BBUs to fail after power outages. In 2013, Verizon demanded that Arris remedy the defective BBUs through replacement and reimbursement. Eventually, Arris and Verizon entered into a settlement that cost Arris $12.56 million. After settling with Verizon, Arris demanded that the CyberPower defendants indemnify it, but the CyberPower defendants refused. Arris asserted claims for breach of contract against CyberPower USA and CP Taiwan.

¶ 6    The settlement between Arris and Verizon was signed on September 26, 2013, and noted that Arris (formerly Motorola) and Verizon had entered into an agreement for the modules in April 2005. The settlement had three main components. Arris would pay $2.43 million to reimburse Verizon for costs to replace the BBUs. By December 31, 2016, Arris would provide 153,000 replacement BBUs at a cost of $4.13 million. If Verizon migrated to a new technology in lieu of BBUs, Arris would provide a credit equal to the purchase price for the new technology, provided that the total cost of the replacement BBUs and the credits equal $4.13 million. Arris would also pay $6 million to reimburse Verizon for operating expenses related to replacing the BBUs. The record contains tables listing what was shipped under the settlement and the amount of credit that remained after each shipment. Verizon also entered into a settlement with Tellabs.

## B. Summary Judgment Proceedings

¶ 7

¶ 8    On May 1, 2019, the CyberPower defendants filed a motion for summary judgment, asserting in part that CyberPower USA's duty to indemnify was limited to breaches of the express warranties in the CSA. The warranty period had already expired when the problems with the BBUs arose. The CyberPower defendants further contended that CP Taiwan was not liable because it was not a party to the CSA and was not otherwise bound by its terms. CyberPower USA and CP Taiwan were separate and distinct companies.

¶ 9    Arris also filed a motion for summary judgment, contending in part that indemnity was required under the CSA because Arris's losses were caused by the CyberPower defendants' acts or omissions.

¶ 10    We summarize the affidavits, depositions, and other documents that were attached to the parties' motions.

¶ 11    In his affidavit and deposition, Douglas Summers, CyberPower USA's vice president for sales and marketing, stated that he was the primary point of contact between CyberPower USA and its customers and was responsible for all sales negotiations between CyberPower USA and Arris/Motorola. Summers explained that CP Taiwan was CyberPower USA's design and manufacturing company. CyberPower USA bought products from CP Taiwan and sold those products to customers in the United States. The general manager of CyberPower USA reported to the president of CP Taiwan. Summers recalled among those involved in negotiating the CSA were Summers's "team from Taipei," including "our legal counsel, Bill Jonas," and Robert Lovett, the president of CyberPower USA. According to Summers, the standard warranty offered by CyberPower USA was 36 months. Summers averred that neither he nor any other representatives of CyberPower USA consulted or otherwise communicated with Arris and/or Verizon about the proposed terms of the settlement between those two companies. Also, CyberPower USA was not made aware of the proposed terms before the settlement was executed, and CyberPower USA never consented to the terms.

¶ 12    Lovett, who had been the president of CyberPower USA, stated in his deposition and affidavit that CP Taiwan had been the ultimate parent company of CyberPower USA since 1998, though at times CP Taiwan had owned a company that in turn owned CyberPower USA. In 2007, CP Taiwan became the direct parent of CyberPower USA. CP Taiwan manufactured products and CyberPower USA managed North American sales, marketing, and some engineering. Lovett's main contact at CP Taiwan was Michael Ho. CyberPower USA's in-house counsel was "Bill Joanis." Generally, CP Taiwan would be aware that there was a customer relationship or one was about to be established. CP Taiwan had no say over who CyberPower's customers were and the opening of business with Motorola was entirely within CyberPower USA's domain. Lovett was involved in the negotiation, review, and execution of the CSA. Lovett stated that the existence of CP Taiwan was not raised and CP Taiwan was not involved in the negotiation and execution of the CSA.

¶ 13    Ho stated in his affidavit that he was president of CP Taiwan, which was the parent company of its wholly owned subsidiary, CyberPower USA. The two entities were separate and distinct corporations, each with its own directors, officers, shareholders, and employees. Further, CP Taiwan was not involved in the negotiation, review, or analysis of the CSA. CP Taiwan was not even aware that CyberPower USA was negotiating a contract with Motorola. Ho also stated that CP Taiwan did not interact or have contact with any of the Motorola employees involved in the CSA before it was signed.

¶ 14    Charles Hsu, a product manager and department head at CP Taiwan, stated in his deposition that he attended meetings in the United States with CyberPower USA employees. Hsu also attended customer meetings in the United States. Asked who were the customers for products other than BBUs, Hsu stated, "[o]urselves mainly through CyberPower USA. *** We authorize CyberPower USA for sales."

¶ 15    In a June 2005 e-mail, Michael Ho invited someone with a "motorola.com" e-mail address to CP Taiwan's office. In another e-mail sent the same day, Douglas Summers thanked Ho for participating in a conference call with that person and noted, "We plan on doing substantial business with Motorola Broadband and Verizon in the future. Your support is greatly appreciated."

¶ 16 In January 2007, Summers e-mailed Hsu about an upcoming design review meeting, at which representatives from Motorola and Verizon would be present. Hsu asked for the purpose and goal of the meeting, stating that he wanted to be prepared. Summers explained that the goal was "to show everyone in attendance that we are the experts" and offered Hsu suggestions. In an April 2007 e-mail, Summers wrote to Hsu, "We had a very successful meeting with Motorola today. They have ordered a few thousand units and are expected to standardize on CyberPower as their primary power supply vendor."

¶ 17 A 2011 e-mail from Hsu to Summers, Ho, and others stated, "We believe that the failure was caused by a transformer design flaw and the known capacitor aged issue. *** I would appreciate if you could have some ideas about the response to the customer." The e-mail mentioned an upcoming meeting related to Tellabs. Lovett, the president of CyberPower USA, was forwarded that e-mail, and then wrote to Ho, "I'm worried that if or maybe when this information [gets] to Verizon we could have a recall. We need something to make this go away."

¶ 18 Also in the record is the January 2013 engineering complaint issued by Verizon related to the BBUs. In a subsequent letter to Motorola, a Verizon employee reported that the BBU failures were the result of a design defect. Verizon requested a remedy under its agreement with Motorola.

¶ 19 An affidavit from Joseph Palmieri, vice president of procurement and supply chain for Arris, stated that Arris demanded indemnity from CyberPower in a letter sent to Michael Ho in April 2013 and in a letter sent to Summers in May 2013. Palmieri stated that CyberPower refused to indemnify Arris. The letters are in the record.

¶ 20 A September 2013 e-mail from Arris to Verizon outlined the terms of the settlement between those two companies and stated in part, "We feel the business relationship of the companies moving forward is more important than the option of a prolonged and potentially contentious dialogue."

¶ 21 Chee Chiu, who had been a senior sourcing manager at Verizon, discussed at his deposition the settlements that Verizon executed with Tellabs and Arris. Chiu stated that Tellabs's settlement was approximately $24 million and Tellabs's estimated liability was approximately $200 million. Meanwhile, Arris's settlement was approximately $12.5 million and Arris's liability was approximately $42 million. Chiu stated that Arris's settlement "was pennies to the dollar" of the associated costs of the recall of the BBUs.

¶ 22 The circuit court held a hearing on the summary judgment motions on August 14, 2019. After the parties' arguments, the court granted Arris's motion for summary judgment and denied the CyberPower defendants' motion for summary judgment. In an oral ruling, the court further found that CP Taiwan was liable because there was enough in the record to establish actual authority.

¶ 23 C. Motion for Prejudgment Interest

¶ 24 On September 30, 2019, Arris filed a motion for prejudgment interest and attorney fees. Arris stated that the CSA was a written instrument under the Interest Act (815 ILCS 205/2 (West 2012)) and the judgment amount was clear and ascertainable. In response, the CyberPower defendants asserted that the exact value of the Verizon settlement was speculative because the settlement was partially based on an agreement to provide Verizon with an

undetermined number of replacement BBUs and/or potential credits against future product purchases. The CyberPower defendants also stated that Arris's settlement with Verizon was disproportionately larger than the corresponding settlement between Tellabs and Verizon, even though the basis for Verizon's claims against each seller was virtually identical. According to the CyberPower defendants, Arris executives admitted that Arris entered into the settlement to appease a vital customer and maintain a critical relationship. The CyberPower defendants referenced a transcript of an electronic conversation in September 2013 between Arris's CEO and its head of operation and supply chain, who stated that with respect to the Verizon settlement, "I thought you were just giving away the farm on the BBUs." Arris's CEO stated, "[Tellabs] doesn't have the downside risk with other business that we do; so they can have a stiffer back."

¶ 25 In a written order dated January 13, 2020, the court awarded Arris prejudgment interest in the amount of $3,435,419.29. The court found that the damages were liquidated and the settlement clearly outlined the amount Arris would pay to Verizon as a result of the defective BBUs. The court denied the motion for attorney fees.

¶ 26 On January 24, 2020, the court entered a written final judgment order that awarded Arris $12.56 million in damages, $3,435,419.29 in prejudgment interest, and $1,930.75 in costs. The CyberPower defendants timely appealed.

¶ 27 II. ANALYSIS

¶ 28 A. Indemnity Provision

¶ 29 On appeal, the CyberPower defendants contend that a three-year warranty period in the CSA barred Arris's indemnity claim. According to the CyberPower defendants, the indemnity provision in section 11.2 of the CSA must be read with section 6.4, and those two sections unambiguously limit indemnity for third-party defect claims to three years from delivery of the product. The CyberPower defendants state that section 6.4 is more specific and controls over the general indemnity obligation in section 11.2.

¶ 30 The CyberPower defendants appeal from a grant of summary judgment, which is proper if the pleadings, depositions, and admissions on file, together with any affidavits, show that there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018). The circuit court's entry of summary judgment is reviewed *de novo*. *Virginia Surety Co. v. Northern Insurance Co. of New York*, 224 Ill. 2d 550, 556 (2007). The appellate court reviews the judgment of the circuit court and not the reasons given for that judgment. *Fifth Third Bank v. Brazier*, 2019 IL App (1st) 190078, ¶ 13.

¶ 31 Indemnity provisions are subject to the rules of contract interpretation. *933 Van Buren Condominium Ass'n v. West Van Buren, LLC*, 2016 IL App (1st) 143490, ¶ 43. The cardinal rule is to give effect to the parties' intent, which is discerned from the contract language. *Leak v. Board of Education of Rich Township High School District 227*, 2015 IL App (1st) 143202, ¶ 14. Unambiguous language should be given its plain and ordinary meaning. *Id.* When a contract's provisions can reasonably be read in more than one way, the contract is ambiguous. *Gomez v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 130568, ¶ 21. However, "[t]he mere fact that the parties disagree as to the meaning of a term does not make that term ambiguous." (Internal quotation marks omitted.) *Clarendon America Insurance Co. v. Aargus Security Systems, Inc.*, 374 Ill. App. 3d 591, 596 (2007).

¶ 32    As noted above, section 11.2 of the CSA stated:

> "Supplier will fully defend, indemnify, and hold harmless Motorola and all of its past, present, and future affiliates, *** successors, [and] assigns *** (the 'Motorola Indemnitees') against all Claims brought by a third party under any theory of liability or recovery, arising from, or connected with, Supplier's acts or omissions under this Agreement, or the acts or omissions of the Supplier's past, present, or future offices, directors, employees, contractors, representatives, or agents under this Agreement, including without limitation the delivery of Products that are defective, non-conforming, or that otherwise fail to comply with Supplier's warranties as set forth in this Agreement. Supplier will reimburse the Motorola Indemnitees for all losses, costs, and expenses the Motorola Indemnitees incur as a result of such Claims, including court costs and attorneys' fees."

The CyberPower defendants assert section 11.2 must be read with section 6.4, which stated in part:

> "Supplier represents and warrants that each Product is free of any defect that would pose a potential safety hazard. Further, unless specified otherwise in the applicable Product Schedule, for a period of thirty (30) months from the date of Product delivery or for the period of Supplier's standard warranty, whichever is longer, Supplier expressly warrants that all Products are free from defects in design, materials and workmanship, *** and conform to the Product specifications."

According to the CyberPower defendants, the "acts or omissions" in section 11.2 were limited to warranty claims. The CyberPower defendants state that the standard warranty was three years and the claim about the BBUs was raised more than three years after delivery.

¶ 33    The sweeping language of section 11.2 indicates that the indemnity obligation was not limited in the way the CyberPower defendants assert. CyberPower USA agreed to indemnify Motorola—and then Arris—against third-party claims "arising from" or "connected with" CyberPower USA's acts or omissions. "Arising from" and "connected with" are very broad terms. See *Goff v. Teachers' Retirement System of the State of Illinois*, 305 Ill. App. 3d 190, 195 (1999) ("arising out of" and "in connection with" are very broad terms and an injury arises out of one's employment if its origin is "in some way connected" to the employment so that there is a causal connection between the employment and the injury). Also, the acts or omissions were listed as "including without limitation" the delivery of products that are defective, nonconforming, or otherwise fail to comply with CyberPower USA's warranties. "Including" is a term of enlargement. *Paxson v. Board of Education of School District No. 87*, 276 Ill. App. 3d 912, 920 (1995); see also *Urica, Inc. v. Pharmaplast S.A.E.*, No. CV 11-02476 MMM, 2013 WL 12123230, at *19 (C.D. Cal. May 6, 2013) ("including, but not limited to" reflected intent that list of claims not be considered exclusive); *Solargenix Energy, LLC v. Acciona, S.A.*, 2014 IL App (1st) 123403, ¶ 39 n.10 (unpublished federal decisions are not binding or precedential, but the appellate court may use the same reasoning and logic where it is found to be persuasive). The acts or omissions were not limited to warranty claims and so did not necessarily have to be raised within three years. Section 11.2 did not refer to section 6.4 and the phrase "including without limitation" encompassed acts or omissions that were not covered by warranties. Verizon claimed that the BBUs that CyberPower USA supplied under the CSA were defective. That claim was covered by the broad, plain language of section 11.2. Inserting a requirement that only certain claims were covered, or that those claims must have

been asserted within a particular time, would change the parties' contract, which we may not do. *Szafranski v. Dunston*, 2015 IL App (1st) 122975-B, ¶ 81 (a court cannot change the existing terms of a contract or add new terms of conditions to which the parties did not appear to have assented).

¶ 34     It is very common for an indemnity provision—such as the one in the CSA—not to include an expiration date. *Lloyd Nolan Foundation, Inc. v. Tenet Healthcare Corp.*, 277 F. App'x 923, 927 (11th Cir. 2008). The CSA's indemnity obligations were located in sections 11.1, 11.2, and 11.3. Section 11.1 pertained to death, injury, or property damage claims. Section 11.3 pertained to intellectual property claims, but its last sentence stated, "Supplier agrees that its obligations to indemnify, as set forth in this Section 11, will survive the termination or expiration of this Agreement." The phrase "as set forth in this Section 11" meant the final sentence applied to all three indemnity obligations, including 11.2. The CSA explicitly provided for the indemnity obligation to last beyond the rest of the agreement, adding further support to our conclusion that the three-year warranty did not apply here.

¶ 35     To limit section 11.2's reach, the CyberPower defendants assert that our interpretation of section 11.2 would require them to indemnify Arris for conduct beyond their control. The CyberPower defendants state that the BBUs met CyberPower USA's three-year warranty, but failed within a longer six-year warranty that Motorola extended to Verizon. The CyberPower defendants invoke the principle, found in cases involving the potential indemnification of an entity for its own negligence, that without clear language, it is unreasonable to impose on a party the duty to indemnify against damages entirely out of its control. See, *e.g.*, *Blackshare v. Banfield*, 367 Ill. App. 3d 1077, 1079-80 (2006). The CyberPower defendants note that in *HK Systems, Inc. v. Eaton Corp.*, 553 F.3d 1086, 1092-93 (7th Cir. 2009), a buyer could not use an indemnity clause to insure itself against the consequences of signing a contract that exposed it to a breach of contract claim. Of note, the contract that exposed the buyer to breach was signed after the contract with the indemnity clause went into effect. *Id.* at 1091. The court found that the buyer had a diminished incentive to try to minimize liability when it negotiated the terms of the subsequent contract. *Id.* Here, the contract between Motorola and Verizon was signed over two years before the CSA was signed. The concerns that were present in *HK Systems, Inc.*, are not present here.

¶ 36     By its plain language, section 11.2 of the CSA covered Verizon's claim against Arris, and CyberPower USA breached the CSA when it refused to indemnify Arris. Section 11.2 is unambiguous and entirely resolves Arris's breach of contract claim. As will be discussed, there is a question of material fact about whether CP Taiwan is also liable. Because section 11.2 of the CSA is dispositive, we do not address the parties' arguments about whether other sections apply, including those relating to excessive failures, and whether those other sections of the CSA are ambiguous.

¶ 37                                    B. Reasonableness of the Settlement

¶ 38     The CyberPower defendants next contend that Arris failed to show that the award of $12.56 million in damages—the amount of the Verizon settlement—was reasonable. The CyberPower defendants argue that Arris's settlement was disproportionately larger than the settlement of an identical claim made by Verizon against Tellabs. The CyberPower defendants state that Arris agreed to a disproportionately larger settlement because Verizon was a significant customer.

¶ 39   Where an indemnity agreement covers attorney fees, the indemnitee must establish that its attorney fees were reasonable. See *Lamp, Inc. v. International Fidelity Insurance Co.*, 143 Ill. App. 3d 692, 696 (1986) (where an indemnity contract reimbursed all losses, damages, expenses, costs and attorney fees incurred, the indemnitee is "required to establish, by competent evidence, its reasonable fees and costs"). The indemnitor "is not necessarily liable for the amount the indemnitee unilaterally agreed to pay or did pay its lawyer." *Wilson-Jump Co. v. McCarthy-Hundrieser & Associates*, 85 Ill. App. 3d 179, 182 (1980).

¶ 40   No Illinois case has expanded the required showing of reasonableness to costs other than attorney fees. One unpublished federal decision cited by the CyberPower defendants, *Resolution Trust Corp. v. Harris Trust & Savings Bank*, No. 90 C 7330, 1992 WL 223807, at *9 (N.D. Ill. Sept. 2, 1992), stated that "*Lamp* *** requires that the indemnitee ultimately prove that what it paid was reasonable." *Resolution Trust Corp.* appeared to misread *Lamp*, which was limited to attorney fees, and the court did not explain this apparent expansion of the reasonableness requirement. *Resolution Trust Corp.* is not persuasive.

¶ 41   As stated above, an indemnity provision is construed like any other contract, and its meaning is determined from the language used unless that language is ambiguous. *United States Fidelity & Guaranty Co. v. Klein Corp.*, 190 Ill. App. 3d 250, 254 (1989). Section 11.2 of the CSA stated, "Supplier will reimburse the Motorola Indemnitees for all losses, costs, and expenses the Motorola Indemnitees incur." The word "reasonable" does not appear. Requiring Arris to prove the settlement was reasonable would impermissibly add a new term to the CSA. See *Szafranski*, 2015 IL App (1st) 122975-B, ¶ 81. The circuit court properly awarded Arris the full amount of the Verizon settlement.

¶ 42                                    C. Prejudgment Interest

¶ 43   The CyberPower defendants next contend that the circuit court should not have awarded prejudgment interest because Arris's damages—the amount Arris had to pay Verizon in the settlement—were unliquidated and speculative. The CyberPower defendants also assert that they were not consulted about the Verizon settlement, never consented to its terms, and were never provided a copy of the settlement until after Arris made payments to Verizon.

¶ 44   The circuit court awarded prejudgment interest under section 2 of the Interest Act (815 ILCS 205/2 (West 2012)), which states in part that creditors shall receive interest of 5% a year for all moneys due on any instrument of writing. For a party to recover prejudgment interest, the amount due must be liquidated or subject to an easy determination. *Certain Underwriters at Lloyd's, London v. Abbott Laboratories*, 2014 IL App (1st) 132020, ¶ 71. A claim is unliquidated "[i]f judgment, discretion, or opinion, as distinguished from calculation or computation" is required to determine the amount. (Internal quotation marks omitted.) *Id.*

¶ 45   The parties dispute the proper standard of review. Arris contends that we should review the circuit court's decision to award prejudgment interest for an abuse of discretion. See *id.* (award of prejudgment interest under section 2 of the Interest Act is reviewed for an abuse of discretion). The CyberPower defendants assert that *de novo* review applies. See *Chandra v. Chandra*, 2016 IL App (1st) 143858, ¶ 46 (when the facts show that there is no dispute about the existence of a fixed debt on a written instrument, reviewing courts apply *de novo* review because only issues of law are involved). Even if there were no factual disputes for the circuit court to resolve, making our review *de novo*, the circuit court's award was proper.

¶ 46      We address the CyberPower defendants' assertion that they were not consulted about the Verizon settlement. Section 11.2 of the CSA, which governed the indemnity obligation, did not require Arris to provide notice before settling a third-party claim. Further, Arris alleged that the CyberPower defendants refused to indemnify Arris after the settlement was executed. At the time of the breach, the settlement was in effect.

¶ 47      The Verizon settlement had three main components: (1) Arris would pay $2.43 million to reimburse Verizon for costs already incurred for replacing the BBUs; (2) Arris would provide Verizon 153,000 replacement BBUs by December 31, 2016 (just over three years after the agreement was executed), at a cost of $4.13 million; and (3) Arris would pay $6 million to reimburse Verizon for operating expense costs. The CyberPower defendants contend that the second component—replacing the BBUs—rendered the settlement amount unliquidated. The CyberPower defendants state that the credit amount for the replacement BBUs was time-limited and could vary depending on Verizon's future orders.

¶ 48      The Interest Act "does not require that the instrument of writing specify the exact amount due the creditor. It is enough if it contains a formula from which that amount can be computed with reasonable accuracy." *Residential Marketing Group, Inc. v. Granite Investment Group*, 933 F.2d 546, 549 (7th Cir. 1991). The Verizon settlement's terms for the replacement BBUs met that standard. The settlement states that if Verizon migrates to new technology, Arris will provide a credit equal to the purchase price, provided that the credit must be used for Arris products and "the total cost *** for replacement of BBUs *** and credits issued pursuant to this paragraph (in any combination) will equal [$4.13 million]." We agree with Arris that the settlement essentially gave Verizon a $4.13 million gift card to spend on BBUs or new technology. That Verizon had three years to spend the credit does not change our finding that the amount due could be calculated with reasonable accuracy. Also, the CyberPower defendants concede that Arris ultimately delivered a mix of replacement BBUs and new technology over an 18-month period. But see *Santa's Best Craft, L.L.C. v. Zurich American Insurance Co.*, 408 Ill. App. 3d 173, 191 (2010) (vast disparity between amount sought and amount awarded, together with lengthy evidentiary hearing required to calculate amount due, supported conclusion that damages were not easily determined).

¶ 49      With two cash payments and a specific amount of credit, the amount Arris had to pay Verizon was easily calculable and therefore liquidated. The circuit court properly awarded prejudgment interest. Based on this conclusion, we will not address Arris's alternative argument that it was entitled to prejudgment interest based on unreasonable and vexatious conduct.

¶ 50                                   D. CP Taiwan's Liability

¶ 51      The CyberPower defendants next contend that CP Taiwan could not be held liable under the CSA. The CyberPower defendants argue that the CSA did not expressly authorize CyberPower USA to bind CP Taiwan and there was no other evidence that CyberPower USA had actual authority to bind CP Taiwan. There was also no evidence that CyberPower USA believed it was acting as CP Taiwan's agent. The CyberPower defendants also state that CP Taiwan did not know about the CSA and CyberPower USA was independent from CP Taiwan. Alternatively, the CyberPower defendants contend that questions of fact existed about whether CyberPower USA was the express or apparent agent of CP Taiwan.

¶ 52        Section 1.1 of the CSA stated that "Supplier" included "all entities of each respective Party that control, are controlled by, or are under common control with, that Party" and defined when an entity "controls" another entity. It is undisputed that CP Taiwan was CyberPower USA's parent corporation. But, neither the CSA's definition of "Supplier" nor CyberPower USA's status as a subsidiary was enough to automatically bind CP Taiwan to the CSA. A corporation is a separate and distinct legal entity from other corporations from which it may be affiliated. *Main Bank of Chicago v. Baker*, 86 Ill. 2d 188, 204 (1981). "[T]he mere fact of a parent-subsidiary relationship, without a great deal more, does not give rise to liability." *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 291 (2007). At issue is whether CyberPower USA was CP Taiwan's agent, where CP Taiwan had the right to control CyberPower USA's conduct and CyberPower USA had the power to act on CP Taiwan's behalf. See *Saletech, LLC v. East Balt, Inc.*, 2014 IL App (1st) 132639, ¶ 14.

¶ 53        A principal is liable for those acts of its agent that the agent has actual or apparent authority to perform. *Bank of Waukegan v. Epilepsy Foundation of America*, 163 Ill. App. 3d 901, 906 (1987). Authority may be actual or apparent, and actual authority may be express or implied. *Cove Management v. AFLAC, Inc.*, 2013 IL App (1st) 120884, ¶ 23. Express actual authority is granted explicitly by the principal to the agent. *Id.* Implied actual authority is proven circumstantially by evidence of the agent's position. *Id.* While actual authority of an agent generally requires the authority be founded on the principal's words or acts, the existence of an agency relationship may be shown with circumstantial evidence, including the parties' situation, their acts, and other relevant circumstances. *Saletech, LLC*, 2014 IL App (1st) 132639, ¶ 15.

¶ 54        Meanwhile, "[a]pparent authority arises where the principal, through words or conduct, creates the impression that the agent has the authority to perform the act in question." *Bank of Waukegan*, 163 Ill. App. 3d at 907. To prove apparent authority, the proponent must show that (1) the principal consented or knowingly acquiesced in the agent's exercise of authority, (2) based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal, and (3) the third person justifiably and detrimentally relied on the agent's apparent authority. *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 326 Ill. App. 3d 126, 137 (2001).

¶ 55        There is no evidence of Motorola's belief that CyberPower USA was an agent of CP Taiwan or that Motorola detrimentally relied on CyberPower USA's apparent authority. But there are questions of fact about whether CyberPower USA had implied actual authority to bind CP Taiwan to the CSA. The relationship between CyberPower USA and CP Taiwan is not clearly resolved by the record. There was testimony that CP Taiwan and CyberPower USA had different functions—CP Taiwan manufactured products and CyberPower USA sold those products. Lovett, president of CyberPower USA, stated that the business with Motorola was entirely within CyberPower USA's domain and CP Taiwan had no say in who CyberPower USA's customers were. Ho denied that CP Taiwan was involved in negotiating the CSA and stated he was not even aware that CyberPower USA was negotiating a contract with Motorola. Other evidence suggests that CP Taiwan was indeed involved in the Motorola deal. In June 2005, Ho invited someone with a Motorola e-mail address to CP Taiwan's office. Summers told Ho there would be "substantial business" with Motorola and Verizon. Hsu, a CP Taiwan product manager and department head, attended meetings in the United States with CyberPower USA employees, as well as customer meetings. Hsu stated that CP Taiwan

- 11 -

"[authorized] CyberPower USA for sales." In 2007, Hsu and Summers exchanged e-mails about a design review meeting where Motorola and Verizon would be present. Summers told Hsu that Motorola would likely choose CyberPower USA as its primary power supply vendor. Summers also stated that his "team from Taipei" was involved in negotiating the CSA.

¶ 56    "While agency is a legal concept, the existence and scope of an agency relationship is a fact-intensive inquiry reserved for the finder of fact unless the parties' relationship is so clear as to be undisputed." *McNamee v. Sandore*, 373 Ill. App. 3d 636, 651 (2007). CyberPower USA's independence and CP Taiwan's degree of involvement in the deal are disputed. Summary judgment on CP Taiwan's liability was not warranted. See *id.* at 648 (summary judgment should be denied if the facts in the record present more than one conclusion or inference).

¶ 57    There is also a question of fact about whether, if CyberPower USA did not have actual authority, CP Taiwan later ratified the CSA. Ratification occurs when the principal learns of an unauthorized transaction and retains the benefits of the transaction or takes a position inconsistent with nonaffirmation. *Cove Management*, 2013 IL App (1st) 120884, ¶ 31. With full knowledge of the act, the principal must manifest an intent to abide and be bound by the transaction. *Id.* Again, the record does not fully resolve whether CP Taiwan knew about the CSA. Still, CP Taiwan was involved in addressing the failure of the BBUs. CP Taiwan's involvement raises competing inferences: CP Taiwan, as manufacturer, was merely investigating its product or CP Taiwan was accepting responsibility under the CSA to remedy the situation. Summary judgment on CP Taiwan's liability was not warranted for this reason as well.

¶ 58                                    III. CONCLUSION

¶ 59    For the foregoing reasons, we affirm the grant of summary judgment to Arris based on CyberPower USA's breach of the CSA. We also affirm the award of $12.56 million in damages and $3,435,419.29 in prejudgment interest. However, we reverse the grant of summary judgment as to CP Taiwan's liability under the CSA. The cause is remanded for further proceedings consistent with this order.

¶ 60    Affirmed in part and reversed in part.

¶ 61    Cause remanded.